UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| COMANCHE NATION, OKLAHOMA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. CIV-05-328-F |
| | ) | |
| UNITED STATES OF AMERICA; | ) | |
| et al | ) | |
| | ) | |
| Defendants. | ) | |

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF MOTION FOR TEMPORARY RESTRAINING ORDER

INTRODUCTION

Plaintiff Comanche Nation has filed suit seeking declaratory and injunctive relief against the United States in part for the unconsensual transfer of original Comanche Allotment 2329 to another tribe in violation of Comanche Nation's treaty rights as well as the applicable federal regulations for such transfers.  That transfer, along with Defendants' subsequent actions authorizing or allowing activities on that land without the consent of Comanche Nation, has resulted in the unlawful abrogation of Comanche Nation's jurisdictional authority over this parcel.  Comanche Nation has now learned that Defendants are planning to imminently approve and publish in the Federal Register a Class III gaming compact for Indian gaming on Comanche Allotment 2329 without the consent or involvement of Comanche Nation.  Unless Defendants are restrained from approving and/or publishing approval of the compact, Comanche Nation will be irreparably harmed through an unlawful deprivation of its jurisdictional authority. Moreover, once it becomes effective,  the Compact may be difficult to collaterally attack,

1

and its term will not expire until 2020. Comanche Nation's request for this emergency relief is narrowly tailored in that it seeks only to preserve the status quo until this Court shall have the opportunity to consider and rule on the merits of the case.  Specifically, Comanche Nation is not asking the Court, at this phase of the litigation, to interfere with Class II gaming currently taking place on Comanche Allotment 2329, though Comanche Nation strongly objects to any activity thereon without its consent and will seek to establish that such consent is required as the underlying complaint proceeds.

## FACTS

Comanche Allotment 2329 was part of the Kiowa, Comanche, and Apache (KCA reservation) established by the 1867 Treaty of Medicine Lodge that was later allotted to Comanche Tribal member Charlie Kerchee and held in trust by the United States.  (See Exhibits 1 and 2).  On December 4, 1986, Robert Rowell – a member of the Kiowa Tribe – purchased 0.53 acres of Comanche Allotment 2329 from an heir of the deceased original allottee and the land remained held in trust by the United States.  (See Exhibit 3). Mr. Rowell began to operate a bingo hall, after which the Bureau of Indian Affairs ("BIA") directed him to discontinue such activity without a license from the Comanche Nation because the gaming facility was located on an original Comanche allotment and thus was within the Comanche Nation's jurisdiction.  (See Exhibit 4).  Mr. Rowell then leased the bingo hall to the Fort Sill Apache Tribe.  (See Exhibit 4).  The BIA responded by directing the Fort Sill Apache Tribe to refrain from gaming activities without a license from Comanche Nation, again because of Comanche Nation's jurisdiction over the parcel.

When the Fort Sill Apache Tribe subsequently sought to purchase Comanche Allotment 2329 in late 1992 and early 1993, the BIA, as required by the Treaty of Medicine Lodge and the federal regulations governing trust acquisitions (25 C.F.R. § 151.8), informed Comanche Nation and asked whether the Nation consented to the transfer.  (See Exhibit 5).  On August 16, 1993, the Comanche Nation objected to the acquisition (See Exhibit 6), and, as required by law, the BIA denied Fort Sill Apache's request.  (See Exhibit 7).  In May, 1995, Fort Sill Apache Tribe again sought to acquire Comanche Allotment 2329. (See Exhibit 8).  This time around, Defendants' predecessors in office reversed course and, in violation of applicable law, approved the acquisition for gaming purposes without notice to, without the consent, and over the previously expressed objection of Comanche Nation.  The transfer was finalized in April 1999.  (See Exhibit 9).

Since the transfer of Comanche Allotment 2329 to the Fort Sill Apache Tribe in 1999, the Comanche Nation has sought to clarify its continuing jurisdiction over the parcel, contending that, because the transfer was not in accordance with its Treaty or other federal law, Comanche Nation could not have been unilaterally divested of its pre-existing jurisdiction.  (See Exhibit 10).  Multiple meetings with Defendants' predecessors have been to no avail, nor has an action brought by Comanche Nation in the Court of Indian Offenses for the Anadarko Agency of the BIA convened as The Comanche Nation Tribal Court ("Tribal Court"), which remains pending.  (See Exhibit 10).  In addition, Comanche Nation has objected to two additional acquisitions of original Comanche allotments by the Fort Sill Apache Tribe which also remain pending.  (See Exhibit 10).

To date, however, Comanche Nation, with the full knowledge and endorsement of the BIA, still bears the responsibility of exercising criminal law enforcement jurisdiction

on Comanche Allotment 2329, including the issuance of criminal citations.  (See Exhibit 11).  A substantial portion of these law enforcement services are provided at the direct request of the casino itself.  (See Exhibit 11).  The criminal prosecutions that arise from these activities take place in Tribal Court.  (See Exhibit 11).  However,  Defendants continue to refuse to acknowledge Comanche Nation's regulatory and tax jurisdiction over the same parcel.

Defendants' approval and publication of a Class III compact between the State of Oklahoma and the Fort Sill Apache Tribe will immediately and irreparably harm Comanche Nation by authorizing a substantial escalation in gaming and other commercial activity that Comanche Nation will continue to be precluded from exercising regulatory and tax jurisdiction over. (See Exhibits 10 and 11).  The escalation in gaming will likely result in a substantial increase in the number of people using this parcel and the surrounding lands and roads, an increase in the number and amount of financial transactions, and a substantial increase in commercial activity.  (See Exhibits 10 and 11).

These increases will result in a substantial likelihood of increased criminal activity, which will impact Comanche Nation and its members, who reside in the vicinity of the casino.  (See Exhibit 11).  Further, Comanche Law Enforcement Department will bear the burden of enforcing criminal laws regarding such increased activity on and near this parcel.  (See Exhibit 11).  The increase of activities, including the likely increase in criminal activity, will result in a substantial addition to Comanche Nation law enforcement responsibilities without Comanche Nation having the ability to exercise any regulatory authority as a means of mitigating problems as they arise, and without the ability to exercise any tax authority in order to fund the additional burden.  (See Exhibits 10 and 11).

Further, since the Class III Compact, if approved and published, will be in effect until 2020, and will be between two sovereign entities, Comanche Nation's ability to challenge the Compact once it is approved may face substantial constraints. (See Exhibit 10). And perhaps most significant is the additional interference with Comanche Nation's right of self-government in the authorization of regulatory activities by the State of Oklahoma within Comanche Nation's jurisdiction.

On the other hand, no harm will befall Defendants in delaying their approval and publication of the compact, pending a determination by this Court whether such is appropriate. Defendants' actions at this point would be wholly ministerial. The content of the compact at issue is that language approved by Oklahoma voters on November 2, 2004, as an offer to Oklahoma tribes to accept. (See Exhibit 10). Fifteen (15) other tribes have accepted the offer and had their compacts approved and published in the Federal Register by Defendants. (See Exhibit 10). Any concerns of Defendants regarding the content of the compacts was vetted in discussions with the initial tribes to submit compacts for approval. (See Exhibit 10). In other words, the approvals and publication at this point are virtually automatic.

I.     **The Court Should Issue a Temporary Restraining Order Against Defendants' Approval and Publication of the Compact for the conduct of Class III on Comanche Allotment 2329.**

   a.  *Four-Part Test for a Preliminary Injunction and TRO*

Injunctive relief pursuant to Fed. R. Civ. P. 65 is appropriate in actions to prevent the violation of a statute or regulation by an administrative agency. See, e.g., Patriot, Inc. v. Dept. of Housing and Urban Development, 963 F. Supp. 1, 4 (D.D.C. 1997) (granting preliminary injunction to prevent department from acting in derogation of plaintiff's interests and to preserve status quo). A temporary restraining order is appropriate where

emergency relief is necessary to hold the status quo in place until the court has an opportunity to hear a request for fuller relief, such as a preliminary injunction. *See, e.g.,* Hospital Resource Personnel, Inc. v. United States, 860 F.Supp. 1554, 1556 (S.D. Ga. 1994). The legal standard is the same as that for preliminary injunction. *See, e.g.,* Reproductive Services v. Keating, 35 F.Supp.2d 1332, 1334 (N.D.Okla. 1998) (citing Mitel, Inc. v. Iqtel, Inc., 124 F.3d 1366, 1370 (10th Cir.1997)).

Comanche Nation can establish the four factors necessary to obtain a preliminary injunction: (1) it will suffer irreparable harm if the injunction is not granted; (2) its threatened injury outweighs the harm caused to the opposing party as a result of the injunction; (3) the injunction is not adverse to the public interest; and (4) it has a substantial likelihood of success on the merits of the case. Dominion Video Satellite, Inc. v. Echostar Satellite, 356 F.3d 1256, 1260 (10th Cir. 2004). Moreover, given the presence in this case of the first three factors, the test for the last factor – the substantial likelihood of success on the merits – becomes less strict, and Comanche Nation need only demonstrate that there are "questions going to the merits ... so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation." Prairie Band of Potawatomi Indians v. Pierce, 253 F.3d 1234, 1246, 1247 (10th Cir. 2001) (internal citations omitted).

### b.   *Comanche Nation will Suffer Irreparable Injury Unless the Injunction Issues*

A finding of irreparable harm is based on such factors as the difficulty in calculating damages, the loss of a unique product, and existence of intangible harms such as loss of goodwill or competitive market position. Dominion Video Satellite, Inc. v. Echostar Satellite**,** 356 F.3d 1256, 1264 (10th Cir. 2004). An Indian Tribe's sovereign

governmental authority to regulate the activities within its jurisdiction is a unique and intangible power, the interference with which is not easily calculable and certainly not fully compensable with money damages. Prairie Band, at 1250 (determining that a "significant interference with tribal self-government constitutes irreparable harm"), citing Seneca-Cayuga Tribe v. State of Oklahoma, 874 F.2d 709, 716 (10th Cir. 1989) (affirming the use of preliminary injunction).

Defendants' approval and publication of the Class III compact for Comanche Allotment 2329 without Comanche Nation's consent constitutes a significant interference with its right of self-government that will cause immediate and irreparable harm to Comanche Nation. The Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701, et. seq., was intended to promote, rather than hinder, strong tribal government, but Defendants' actions, if not restrained will undermine Comanche Nation self-governance. Approval and publication of the Compact will authorize State regulatory involvement on Comanche Allotment 2329. It will also result in increased gaming and other commercial activity, which will place an additional burden on Comanche Nation law enforcement without Comanche Nation being able to exercise regulatory control over such activity or to exercise any tax authority in order to fund the additional burden. Comanche Nation, and in particular its Law Enforcement Department, will thus bear the substantial costs and burdens of the additional gaming while obtaining no benefits and without being able to exercise any regulatory control as a means of mitigating problems as they arise. Finally, since the Class III Compact will be in effect until 2020, and will be between two other sovereign entities, Comanche Nation's ability to challenge the Compact once it is approved may face substantial constraints.

7

### c.   The Balance of Harms Weighs Heavily in Favor of the Tribe

As previously noted, the Comanche Nation will suffer immediate and irreparable harm if Defendants are not restrained from approving and publishing the Class III Compact for gaming on Comanche Allotment 2329.  Defendants, on the other hand will suffer no harm.  Defendants are now routinely, ministerially approving and publishing such compacts having satisfied themselves with earlier identically worded compacts that they do not offend federal law by their terms.  Defendants will bear no additional financial or regulatory burden from any delay in approval of the Compact.  Accordingly, delay for Defendants, pending the Court's ruling on the underlying complaint is inconsequential.  Further, Comanche Nation's application for a temporary restraining order is narrowly tailored to preserve the status quo with respect to Class III gaming only, while the merits of the case are heard and ruled upon by the Court.  In light of these circumstances, the potential harm to Comanche Nation greatly outweighs any adverse consequences to Defendants resulting from issuance of the restraining order.

### d.   The Injunction is Not Adverse to the Public Interest

The public interest will not be negatively affected, but rather furthered, by maintenance of the status quo, pending a determination by this Court whether Comanche Nation maintains jurisdiction over Comanche Allotment 2329.  Introduction of Class III Compact requirements, activities, and state interaction on Comanche Allotment 2329 prior to that determination introduces additional jurisdictional complexities and questions regarding the rule of law to be applied to the public and the activities they engage in thereon.  Further, introduction of Class III gaming on Comanche Allotment 2329 will substantially increase the burden on the law enforcement agency that enforces criminal law on that parcel – the Comanche Nation Law Enforcement Department – while at the

same time continuing to deprive the Nation with the regulatory and tax authority necessary to address this increased burden.  It is not in the public interest to increase the burden on law enforcement while depriving Comanche Nation of the tools it needs to effectively address this increase.

   e.  *The Comanche Nation has a Substantial Likelihood of Success on the Merits*

The key issue in this case centers on Defendants' unlawful, unilateral transfer of Comanche Allotment 2329 to the Fort Sill Apache Tribe without the consent of the Comanche Nation.   Such action violated the relevant treaties, applicable federal regulations, and the clear precedent established by the Tenth Circuit Court of Appeals. Because it was unlawful, such action did not and could not have divested Comanche Nation of its preexisting regulatory and tax jurisdiction over Comanche Allotment 2329, and such jurisdiction therefore remains.

   1.  **Unconsented Transfer of Comanche Allotment 2329 Violated Comanche Nation's Treaty Rights.**

The KCA Reservation was created on October 21, 1867, by the Treaty of Medicine Lodge #1, 15 Stat. 581 (See Exhibit 12),  which granted the Kiowa Tribe and Comanche Nation a large expanse of land for the "absolute and undisturbed use and occupation of the tribes herein named and for such other friendly tribes or individual Indians as, from time to time, they may be willing [with the consent of the United States*] to admit among them."  Treaty of Medicine Lodge #1, Art. 2 (alteration in original).  Thus, this treaty grants those Tribes the exclusive tribal right to the KCA Reservation unless they consented to sharing that reservation with other tribes.

On the same day that the Treaty of Medicine Lodge #1 was signed, the United States and the Kiowa Tribe and Comanche Nation demonstrated their interpretation of the

9

phrase "they may be willing [with the consent of the United States*] to admit among them."  These three sovereigns, together with the Apache Tribe, entered into a treaty that provided for the settlement of the Apache Tribe (a distinct tribal entity from the Fort Sill Apache Tribe) on the KCA reservation, in which the Comanche Nation and Kiowa Tribes consented to "jointly and equally" share the KCA Reservation with the Apache Tribe. October 21, 1867, Treaty of Medicine Lodge #2,  15 Stat. 589, Art. 2. (See Exhibit 13)**.**

The Treaty of Medicine Lodge #2 contains a degree of disclosure, informed consent, level of governmental authority involved in the agreement, extent of equality among the tribes, and specificity of the shared benefits and conditions of the reservation that firmly established that the Apache Tribe would be joining the Comanche Nation and the Kiowa Tribe on their common reservation with their express consent, as required by the Treaty of Medicine Lodge #1.  The Treaty of Medicine Lodge #2 clearly evinces that the KCA Tribes, as well as the United States, were well aware of the means of establishing another tribe on the KCA Reservation pursuant to the consent requirement contained in the Treaty of Medicine Lodge #1.

Such means were not followed when Defendants transferred Comanche Allotment 2329 to another tribe.  The Comanche Nation never consented to the placement of another tribe on the KCA Reservation.  Defendants thus transferred Comanche Allotment 2329 – which is located on the KCA Reservation – to another tribe without Comanche Nation's consent.  Doing so violated the Treaty of Medicine Lodge.  Accordingly, such transfer was unlawful, and such transfer did not and could not diminish Comanche Nation's jurisdiction over that parcel.

**2.  Unconsented Transfer of Comanche Allotment 2329 Violated Federal
    Trust Acquisition Regulations**

Federal trust acquisition regulations require that "[a]n individual Indian or tribe
may acquire land in trust status on a reservation *other than its own* only when the
governing body of the tribe having jurisdiction over such reservation consents in writing
to the acquisition."   25 C.F.R. § 151.8 (emphasis added).   This regulation was
promulgated as a means of carrying out Defendants' trust property acquisition authority
pursuant to Section 5 of the Indian Reorganization Act ("IRA"), a statute that was passed
in order to preserve and restore tribal land and tribal jurisdiction.   25 U.S.C. §§ 461, et
seq.  *See* Acquisition of Title to Land in Trust, 64 Fed. Reg. 17574, 17576 (1999) ("One
of the primary goals of the IRA was the restoration to tribal ownership of allotted land
within existing reservations.")[1] Nothing in Section 5 of the IRA authorizes Defendants to
diminish a tribe's sovereign territory.  Simply stated, Section 5 of the IRA does not grant
Defendants the authority to reduce a tribe's existing jurisdiction for the purpose of
increasing the lands of another tribe, nor do its implementing regulations.   Yet
Defendants here determined not to comply with the express and unequivocal consent
requirements of 25 C.F.R. § 151.8 with respect to the transfer of Comanche Allotment
2329.

Comanche Allotment 2329 is located on the KCA Reservation.  It is *not* located
on the reservation of the Fort Sill Apache Tribe.  25 C.F.R. § 151.8 thus required the
Department of Interior to obtain the consent of the Comanche Nation (the tribe with

---

[1] *See also*  Readjustment of Indian Affairs, Hearing before the Committee on Indian Affairs, 73d Cong. 2nd
Sess. on H.R. 7902, at 16-1; Felix S. Cohen, Handbook of Federal Indian Law 147 (1982 ed.); United
States' Petition for Writ of Certiorari in Department of the Interior v. South Dakota, 519 U.S. 919 (1996)
(arguing that Section 5, which permits tribal land acquisition, is a central component of the IRA designed
by Congress to reverse the horrendous loss of tribal lands during the prior allotment process through the
restoration and replacement of lands and related economic opportunities lost through allotment).

"jurisdiction over such reservation") prior to transferring such land to the Fort Sill Apache Tribe "on a reservation other than its own."

Furthermore, federal trust acquisition regulations require the Defendant to inform State and local governments of pending trust petitions for both on-reservation and off-reservation acquisitions.  25 C.F.R. §§ 151.10, 151.11.  The State and local governments are provided a thirty (30) day period in which to submit written comments regarding the proposed transaction's impact on their regulatory jurisdiction and taxation.  Id. Defendants are required to consider such taxation and jurisdictional impacts in evaluating whether to approve a pending acquisition.  Id.  In evaluating the transfer of Comanche Allotment 2329, Defendants determined not to adhere to such notice and comment period though substantial jurisdictional impacts were implicated for Comanche Nation.

### 3. Unconsented Transfer of Comanche Allotment 2329 was Contrary to Tenth Circuit Precedent Directly on Point.

In Citizen Band Potawatomi Indian Tribe v. Collier, 142 F.3d 1325 (10th Cir. 1998), the Tenth Circuit affirmed a decision of the Western District of Oklahoma determining that because the Absentee Shawnee Tribe does not share the Potawatomi Reservation with the Citizen Band Potawatomi Indian Tribe, the BIA may not acquire land in trust for the Absentee Shawnee Tribe without complying with the consent provisions of 25 C.F.R. § 151.8.   In the Potawatomi case, consent was required though: (1) the Absentee Shawnee settlement of the area had preceded the Citizen Band Potawatomi by thirty years and was known to the United States and the Citizen Band Potawatomi; (2) the land at issue was fee land to be acquired in trust, rather than existing trust land over which a tribe exercised authority; and (3) the Absentee Shawnee had entered into an agreement with the United States contemporaneous with the Citizen Band

Potawatomi in which tribal members received original trust allotments on the reservation area.  Id.

Defendants here chose to ignore Potawatomi despite the fact that the Comanche Nation's circumstances are much more compelling:  (1) Comanche Nation was signatory to Treaties of Medicine Lodge establishing the KCA Reservation with right of consent for settlement of other tribes therein and of which there was none; (2) Comanche Allotment 2329 originated from the KCA Reservation, was allotted to a Comanche tribal member, held in trust, and governed under the laws of the Comanche Nation (which only came into question with the unconsented transfer); (3) the Fort Sill Apache Tribe was not a signatory to the Treaties of Medicine Lodge, was not granted original allotments on the KCA Reservation, and was seeking a parcel of land over which the Comanche Nation and United States agreed was under the jurisdiction of the Comanche Nation.

In sum, in light of Defendants' failure to adhere to Comanche Nation's Treaty rights, the federal trust acquisition requirements, and applicable Tenth Circuit precedent, there is a substantial likelihood that Comanche Nation will prevail on the merits and, in any event, has raised "questions going to the merits ... so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation." Prairie Band, 253 F.3d at 1246, 1247 citing Federal Lands Legal Consortium v. United States, 195 F.3d 1190, 1194 (10th Cir.1999).

## REQUEST FOR WAIVER OF SECURITY

Comanche Nation respectfully requests a waiver of the security under Fed. R. Civ. Pro. 65(c), or, in the alternative, for a nominal security.  As demonstrated above, issuance of a T.R.O. and a preliminary injunction would not result in any harm –

financial or otherwise – to Defendants that would necessitate security.  Where there is no harm to Defendants, security is not required.  Wright, Miller & Kane, 11A Fed. Prac. & Proc. Civ.2d § 2954, text and cases at fn. 12.  Further, where, as here, the overwhelming balance hardships rests on Plaintiff and not Defendant, security is generally not required.  *See* Elliott v. Kiesewetter, 98 F.3d 47, 60 (3d Cir. 1996).  The court should waive security or, in the alternative, require only nominal security from the Tribe.

Respectfully submitted,

s/ William R. Norman Jr.
William R. Norman, Jr., OBA #14919
Hobbs, Straus, Dean & Walker, LLP
117 Park Avenue, 2nd Floor
Oklahoma City, OK 73102
Telephone: (405) 602-9425
Facsimile: (405) 602-9426
Email:  william@hsdwok.com
**Attorney for Plaintiff**

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the above and foregoing was served this 31<u>st</u> day of March, 2005, via facsimile:

| | |
|---|---|
| Robert McCampbell<br>United States Attorney for the Western<br>District of Oklahoma<br>210 West Park Avenue, Suite 400<br>Oklahoma City, OK 73102 | Alberto Gonzales, Attorney General<br>U.S. Department of Justice<br>Office of the Attorney General<br>Attn:  Service of Process<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20004 |
| Gale A. Norton<br>Secretary of the Interior<br>1849 "C" Street NW<br>6159 MIB<br>Washington, DC 20240 | United States Department of Interior<br>Attn:  James Cason, Assistant Secretary<br>1849 "C" Street NW<br>Washington, DC 20240 |

<u>s/ William R. Norman Jr.</u>
William R. Norman, Jr.