

DEPARTMENT OF THE INTERIOR HEARINGS DIVISION

Comanche Indian Tribe v. Bureau of Indian Affairs

Docket No. HD/ISDA 98-1 (08/20/1998)



# United States Department of the Interior

OFFICE OF HEARINGS AND APPEALS
HEARINGS DIVISION
215 DEAN A. McGEE AVENUE
ROOM 820
OKLAHOMA CITY, OK 73102

| | | |
|---|---|---|
| COMANCHE INDIAN TRIBE | ) | Docket No. HD / ISDA 98-1 |
|  | ) | Indian Self-Determination Act |
|  | ) |  |
| vs. | ) | 25 U.S.C. §§ 450, et seq. |
|  | ) | Emergency Contract Re-assumption |
|  | ) |  |
| BUREAU OF INDIAN AFFAIRS | ) | <u>RECOMMENDED DECISION</u> |

APPEARANCES:   M. Sharon Blackwell, Esq, Tulsa, Oklahoma,
                              for the Bureau of Indian Affairs;
               Kathleen Supernaw, Esq., Tulsa, Oklahoma,
                              for the Bureau of Indian Affairs
               Richard Anderson, Esq., Oklahoma City, Oklahoma
                              for Business Committee Members and Keith Yackeyonney
               Jacquetta McClung, Cache, Oklahoma, Pro Se

BEFORE:        Administrative Law Judge Richard L. Reeh

---

Pursuant to 25 U.S.C. §§ 450, et seq, and 25 C.F.R. §§ 900.170, 171, 252 and 253, this matter was assigned to OHA-OKC on July 27, 1998. A hearing was conducted at the BIA Area Office, Wichita-Caddo-Delaware Complex in Anadarko, Oklahoma on July 29 - 31, 1998.

<u>Factual and Procedural Background</u>

The BIA and Comanche Tribe's Lw Enforcement Services ("LES") Contract CTB06T80803 attained "mature status" in 1993. (Tr. 21 and Ex. G-2, G-4) Awarded in accordance with Public Law 93-638, it is sometimes referred to as a "638 Contract." (Tr. 69) Pursuant to this agreement, the Tribe established a Police Department for delivery of law enforcement services to Comanche citizens. Bob Tomah was chief of the police department for more than thirteen years. In 1998, members of the police department included Toni Timbo, Ron Niedo, John Komahcheet and Leslie Williams. (Tr. 142) Pursuant to a written agreement, the Tribal police department also utilized dispatch and jail services of the Comanche County (Oklahoma) Sheriff. (Ex. G-20)

Marland Toyekoyah, contracting officer at the Anadarko Agency, was responsible for

administering the LES Contract.  (Tr. 17, 18, 50)  Melvin Gibson, a BIA Supervisory Criminal Investigator, the contracting officer's representative, was responsible for monitoring contract compliance.  (Tr. 31, 57, 58)  The government made no allegations of pre-July, 1998 non-compliance with provisions of this agreement.  (Tr. 44)

Springing from a recall election, an intra-Tribal conflict arose in early 1998.  It quickly grew to dangerous proportions.  At 2:00 o'clock in the morning of April 19, acting Tribal chairman Carney Saupity issued a letter terminating police officers Timbo and Neido.  Shortly thereafter, he swore in a new acting chief of police.  (Tr. 65)  Later that day, Bob Tomah told Mel Gibson that he had been terminated as police chief.  (Tr. 66)

Apparently, however, police chief Tomah and other officers continued to act in their (former) capacities because, on June 6, Acting Chairperson Jacquetta McC1ung verbally fired him (together, presumably, with his entire staff) again and advised BIA representatives that she had or would appoint a new force.  At that time, police chief Tomah advised Dr. McClung that he did not recognize either her authority or her actions.  (Tr. 209)  Elected members of the Business Committee, as well as the Tribal Personnel Officer later advised BIA representatives that police chief Tomah's termination should not be recognized.  (Tr. 82, 83)  Tensions escalated.

Prior to the early June confrontations, red flags began to appear.  After Superintendent Betty Tippeconnie formally recognized the recall of Tribal Chairman Yackeyonny on May 19, 1998, Business Committee members Cizek, Chibitty and Tahhahwah wrote the BIA expressing concerns that a faction of tribal individuals was expected to attempt to take over the Comanche Nation by coming to the Headquarters, firing personnel and physically confronting any persons perceived by them to support Mr. Yackeyonney.  (Ex. G-8)

At the regular Tribal meeting June 6, 1998, confrontations occurred, as noted above, but no violence was observed.

On July 7th, Mr. Gibson received correspondence from Dr. McClung requesting a BIA observer for a special Tribal council meeting she scheduled for July 11, 1998.  (Tr. 90)  On July 8th, Dr. McClung came to Mel Gibson's office and introduced acting Police Chief Fernando Torres-Jimenez and acting assistant police chief Thomas M. Atkins.  (Ex. G-12)  She requested BIA assistance in removing police chief Tomah and his officers from Tribal offices.  (Tr. 92)  That same

day, Mr. Gibson received a copy of a memorandum from (former) [1] Tribal Chairman Yackeyonney and members of the Business Committee to police chief Tomah notifying his force that no public gatherings or meetings were to be conducted Saturday, July 11, 1998 at the Comanche Nation Headquarters and that violations were to be treated as criminal trespasses. (Tr. 94, Ex. G-14)

On July 11, 1998, two uniformed forces apparently representing competing factions of the Tribe were situated in one place at the same time.  They were separated only by a chain-link fence and gate.  (Tr. 363)  In addition to these forces, a contingent of Bingo Hall civilian guards (carrying a variety of weapons) was present.  Although significant violence was not observed, tensions were high, (Tr. 111) and BIA investigators believed, "... things were getting real dangerous."  (Tr. 114)  Both experience and common sense suggested to BIA officials that the threat of violence was escalating dramatically.  In their professional opinions, whenever competing armed groups are at odds with one another, there are heightened risks of physical harm to those within the groups as well as to others in the immediate vicinity.  (Tr. 279, 339, 363)

After receiving various communications from competing Tribal entities and in view of the recent Tribal developments, BIA officials (including Marland Toyekoyah, Melvin Gibson, Ted Quasula, and Hilda Manuel) were unable to determine which of two police forces constituted the Tribe's actual law enforcement body.  (Tr. 125, 177, 293, 339)  In this circumstance, because of heightened public safety risks, these BIA officials determined that reassumption of the LES contract was the only prudent avenue available.

Nominal Bases for Reassumption.  The BIA's Notice of Decision to Reassume the Law Enforcement Program, delivered July 23, 1998, indicates that the decision was made because the Secretary had determined that the Tribe was not in compliance with the LES contract in several areas, specifically:  (1) failure to provide normal routine patrols, (2) failure to provide background checks and supportive documentation for members of one of the purported police forces, (3) failure to provide dispatch services and identify headquarters for that force and (4) existence of two law enforcement units for the Tribe and public confusion as to the legitimate force.

_____
[1]   The recall election related to Mr. Yackeyonney's Tribal Chairmanship.  Although the Anadarko Agency Superintendent wrote a memorandum recognizing the recall election's validity, that validity and recognition have been appealed to the Interior Board of Indian Appeals.

Although the government offered some evidence relating to manpower difficulties Police Chief Tomah encountered at times of the Tribe's general meetings, little evidence was offered to support the "failure to provide routine patrols" allegation. (See Tr. 119, 120, 154, 175, 179, 264, 347) No evidence suggested that the newly appointed force was ever involved in patrol activity.

The allegation regarding purported failure to provide background checks and supportive documentation for members of the newly appointed force focused upon that group only. No similar allegation addressed members of police chief Tomah's long-standing police force. (See Tr. 143, ff, 176)

Police chief Tomah's department made arrangements for dispatch and jail services through an agreement with the Sheriff of Comanche County. (Ex. G-20, Tr. 148, 265) Nothing suggested that dispatch services under this agreement were ever interrupted. No evidence was received regarding either dispatch services or a headquarters for Police Chief Torres-Jiminez' force.

Limitation of Evidence. At the hearing's outset, it was announced that no evidence would be received regarding which, if either, competing faction constituted the legitimate government of the Comanche Tribe. Both sides desired, but were denied the opportunity to offer such evidence. Members of the Business Conmittee argued they should be allowed such an opportunity because they believed it would establish that theirs was the legitimate government and the longstanding Tribal Police Department headed by Bob Tomah had been duly appointed, had been recognized by the BIA and had never failed to comply with the LES contract. In consequence, they reasoned, the agreement should never have been reassumed. (Tr. 442, ff) Acting Chairperson McClung believed that she also should have had an opportunity to present evidence regarding the legitimacy of her position as well as validity of the new force's appointment. She reasoned that she was never afforded an opportunity to complete the law enforcement appointment process. Determination of which fiction constituted the legitimate Tribal government was, however, beyond the scope of these proceedings.

The Principal Basis and Issue. During the hearing, it became clear that issues relating to patrol, dispatch, documentation and headquarters were secondary to the reassumption decision. The government's primary concern related to the undisputed existence of competing law enforcement units. Government witnesses agreed that, where there are two or more police or security forces present in one place and these forces are apparently representing adverse political factions of '

turmoiled Tribal government, there is an increased risk of physical harm to members of those forces as well as to every other person present.

No one seriously disagreed with this logic, and public safety constituted the over-riding consideration upon which the government's decision was based. The mere fact of the existence of two adverse armed police forces competing for the same Tribal work under circumstances described above presents a significant danger and is sufficient cause for the reassumption.

### Recommended Decision

The reassumption decision was appropriate. BIA Officials' concern for public safety was wen founded. It would have been unreasonable for the Secretary to fail to reassume the Law Enforcement Services when an increased risk of physical harm would have resulted from failure to do so. Interests of public safety dictated such a decision.

### Notice of Right to Object

Within 15 days of the receipt of this recommended decision, you may file an objection to the recommended decision with the Interior Board of Indian Appeals (IBIA) under 25 CFR.900.165(c). An appeal to the IBIA under 25 CFR 900.165 shall be filed at the following address: Board of Indian Appeals, 4015 Wilson Boulevard, Arlington, VA 22203. You shall serve copies of your notice of appeal on the Secretary of the Interior, and on the official whose decision is being appealed. You shall certify to the IBIA that you have served these copies. If neither party files an objection to the recommended decision within 15 days, the recommended decision will become final.

//original signed
Richard L. Reeh
Administradve Law Judge