

United States Department of the Interior

OFFICE OF THE SOLICITOR
Southwest Regional Office
505 Marquette Avenue NW, Suite 1800
Albuquerque, NM 87102
Telephone: (505) 248-5600
Facsimile: (505) 248-5623



December 2, 2008

**MEMORANDUM**

TO: Max Dickens, Assistant Special Agent in Charge
BIA-OJS District IV

THROUGH: Lynn A. Johnson, Regional Solicitor

FROM: Sue E. Umshler, Attorney-Adviser

SUBJECT: Fort Sill Apache Trust Property – Criminal Jurisdiction

I.  ISSUE

Does federal criminal jurisdiction apply to the 30 acres of land taken into trust for the Fort Sill Apache Tribe in southwestern New Mexico?

II.  SHORT ANSWER

Because the 30 acres is held in trust, without any explicit exception by Congress, it is "Indian country" under 18 U.S.C. § 1151. As such, the federal government and the Tribe have exclusive criminal jurisdiction over Indians on the property by statute, an alternative assertion of jurisdiction recognized in the New Mexico cession statutes.[1] Because the property was acquired after 1940, the State of New Mexico ("State" or "New Mexico") retains criminal jurisdiction over non-Indians on the property.[2] Therefore, the State and the United States have concurrent criminal jurisdiction over non-Indians. The two possible sources of jurisdiction, "legislative" and "Indian country" status are analyzed in detail below.

---

[1]   The New Mexico statutes do not "prevent or impair any transfer of legislative jurisdiction" occurring by operation of law. N.M. STAT. ANN. § 19-2-4 (1978).

[2]   The federal government may request exclusive jurisdiction for all legislative purposes under the current New Mexico cession process, which requires an act of the state legislature and formal acceptance by the Secretary or other authorized officer of that jurisdiction pursuant to federal law for property acquired after 1940. *See* N.M. STAT. ANN. § 19-2-2 (1978); 40 U.S.C. § 3112 (2007). The current state cession process limits jurisdiction transfers to concurrent or partial jurisdiction after 1963. N.M. STAT. ANN. § 19-2-3(C).

RECEIVED
DEC 0 4 2008
BUREAU OF INDIAN AFFAIRS
SOUTHWEST REGIONAL OFFICE
OFFICE OF JUSTICE SERVICES

III.  BACKGROUND

Thirty acres of land near Akela in Luna County, New Mexico, were conveyed to the Tribe in fee by Special Warranty Deed from the Schoeppner Family Trust on October 23, 1998. The Tribe passed a resolution authorizing the purchase of the property on April 20, 1999. The property was taken into trust for the Tribe on June 26, 2002, by a deed conveying the property to the United States in Trust for the Fort Sill Apache Tribe dated June 13, 2000. By resolution dated April 6, 2006, the Tribe requested that the property be proclaimed "Reservation" pursuant to Section 7 of the Indian Reorganization Act, 25 U.S.C. § 467.

IV.  ANALYSIS

   A.  Legislative Jurisdiction

The law recognizes four types of legislative jurisdiction, each with a different division of authority between the federal and state governments and their respective political subdivisions; exclusive jurisdiction, concurrent jurisdiction, partial jurisdiction, and simply a proprietary interest.[3] The status of the Fort Sill Apache property need only be analyzed under concurrent jurisdiction and exclusive jurisdiction because the federal government does not own the property as a mere proprietor nor has New Mexico acted to reserve only "partial" jurisdiction.

   1.  *Exclusive Jurisdiction*

Exclusive jurisdiction exists when the federal government possesses all of the state's authority. Congress has the sole authority to legislate in exclusive jurisdiction areas and the federal government has exclusive responsibility for law enforcement. In these areas the state has not reserved to itself the right to exercise any concurrent authority with the United States except, at most, the right to serve civil or criminal process on such land in regard to activities that occurred outside of it.[4] The state cannot enforce its laws and regulations in such areas.

---

[3]   This framework was established by the leading case, *Fort Leavenworth v. Lowe*, 114 U.S. 525, 526-27 (1885) and continuously applied in subsequent cases since 1885 by the Supreme Court and lower federal courts. See *Lowe*, 114 U.S. at 530; *Benson v. United States*, 146 U.S. 325 (1892); *Palmer v. Barrett*, 162 U.S. 399 (1896); *Arlington Hotel Co. v. Fant*, 278 U.S. 439 (1929); *Surplus Trading Co. v. Cook*, 281 U.S. 647 (1930); *United States v. Unzeuta*, 281 U.S. 138 (1930); *James v. Dravo Contracting Co.*, 302 U.S. 134 (1937); *Collins v. Yosemite Park & Curry Co.*, 304 U.S. 518 (1938); *James Stewart Co. v. Sadrakula*, 309 U.S. 94 (1940); *S.R.A. Inc. v. Minnesota*, 327 U.S. 558 (1946); *Howard v. Comm'r of the Sinking Fund of the City of Louisville*, 344 U.S. 624 (1953); *Paul v. United States*, 371 U.S. 245 (1963); *Humble Pipe Line Co. v. Waggonner*, 376 U.S. 369 (1964); *Kleppe v. New Mexico*, 426 U.S. 529 (1976); *St. Louis-San Francisco Ry. Co. v. Satterfield*, 27 F.2d 586 (8th Cir. 1928); *Markham v. United States*, 215 F.2d 56 (4th Cir. 1954); *United States v. Johnson*, 426 F.2d 1112 (7th Cir. 1970); *United States v. Redstone*, 488 F.2d 300 (8th Cir. 1973); *Crook, Horner & Co. v. Old Point Comfort Hotel Co.*, 54 F. 604 (E.D. Va. 1893); *United States v. Heard*, 270 F. Supp. 198 (W.D. Mo. 1967).

[4]   *Nevada v. Hicks*, 533 U.S. 353, 362 (2001) ("... as we explained in the context of federal enclaves, the reservation of state authority to serve process is necessary to prevent such areas

The federal government may acquire exclusive legislative power by consensual acquisition of land from a state or condemnation[5] pursuant to Art. I, § 8, cl. 17 of the Constitution, which states "[Congress shall] exercise exclusive Legislation ... over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings." The phrase "needful buildings" has been broadly construed to include all types of property acquired by the federal government for any legitimate purpose beyond those enumerated on the Constitutional list.[6] The power can only be obtained "at the will of the state" because it is a grant of state power to the federal government.[7] The federal government can obtain exclusive power involving nonconsensual land acquisition by the state's subsequent cession of legislative authority over the land.[8]

The United States usually, but not always, obtained "exclusive legislative jurisdiction" over property it acquired prior to February, 1940. On that date, a federal statute was enacted clarifying that exclusive jurisdiction was not necessary in all situations and must be explicitly accepted by the federal government.[9] While federal exclusive jurisdiction was presumed prior to 1940, thereafter it could only be explicitly obtained through the current state cession process.[10] The law also required that jurisdiction be accepted in writing by the head of the agency or other authorized officer.[11] The purpose of the 1940 Act was to "create a definite method of acceptance

---

from becoming an asylum for fugitives from justice." (citing *Fort Leavenworth R. Co. v. Lowe*, 114 U.S. 525, 533 (1885)).

[5] *Lowe*, 114 U.S. at 532.
[6] *See Collins*, 304 U.S. at 528-30.
[7] *Lowe*, 114 U.S. at 530.
[8] *Id.* at 531, 538-39.
[9] Congress passed legislation to make permissive the acquisition of legislative jurisdiction over land or interests acquired by the federal government. Act of Feb. 1, 1940, Pub. L. No. 409, ch. 18, 54 Stat. 19 (codified at 40 U.S.C. § 3112, formerly 40 U.S.C. § 255). The identical language appeared in another statute later that year, but both statutes have been codified at 40 U.S.C. § 3112. *See* Act of Oct. 9, 1940, Pub. L. No. 825, ch. 793, 54 Stat. 1083, 1084. The relevant language is:

> The obtaining of exclusive jurisdiction in the United States over lands or interests therein which have been or shall hereafter be acquired by it shall not be required; but the ... department ... or agency of the Government may, in such cases and at such times as he may deem desirable, accept or secure from the State in which any lands or interests therein under his immediate jurisdiction, custody, or control are situated, consent to or cession of such jurisdiction, exclusive or partial, ... and indicate acceptance of such jurisdiction on behalf of the United States by filing a notice of such acceptance with the Governor of such State or in such other manner as may be prescribed by the laws of the State where such lands are situated. Unless and until the United States has accepted jurisdiction ... it shall be conclusively presumed that no such jurisdiction has been accepted.

[10] *Paul*, 371 U.S. at 265; *Johnson*, 426 F.2d at 1114; *Redstone*, 488 F.2d at 302; *Markham*, 215 F.2d at 58; *Heard*, 270 F.Supp. at 200; 40 U.S.C. § 3112 (formerly 40 U.S.C. § 255).
[11] *Id.*

3

of jurisdiction so that all persons could know whether the [federal] government had obtained 'no jurisdiction at all, or partial jurisdiction, or exclusive jurisdiction.'"[12]

The Fort Sill property was conveyed to the federal government after 1940 and without seeking or obtaining the New Mexico's permission to acquire the land prior to the original conveyance. Therefore, exclusive jurisdiction is not presumed. Further, the record does not show that the requisite process under both federal and state law[13] was invoked to obtain exclusive federal legislative jurisdiction. There are no cession statutes specific to the property in either federal or state law.

2. *Concurrent Jurisdiction*

Concurrent legislative jurisdiction applies to those situations where the federal and state governments exert their full jurisdictional powers simultaneously over a particular tract of land. In other words, the state has reserved the right to exercise all of its legislative authority concurrently with the United States over property where the federal government exerts some type of exclusive legislative authority. State regulation is only limited "so as to not interfere" with federal functions.[14] In these situations, both state and federal laws are applicable and provide penalties for major crimes.[15] New Mexico will only grant concurrent or partial jurisdiction since its statutory revision in 1963.[16]

There is concurrent jurisdiction over the Fort Sill property because the federal government has

---

[12]   *Adams v. United States*, 319 U.S. 312, 314 (1943) (criminal charges by the United States dismissed because the land was acquired after 1940 and the federal government had not affirmatively asserted exclusive jurisdiction at a military camp).
[13]   *See* supra note 9; N.M. STAT. ANN. § 19-2-2 (1978). The State process is:
"(A)...a duly authorized department, agency or officer, shall file a notice of intention to acquire or relinquish such legislative jurisdiction ... with the governor. The notice shall contain a description adequate to permit accurate identification of the boundaries of the land or other area for which the change in jurisdictional status is sought and a precise statement of the measure of legislative jurisdiction sought to be transferred ... the governor shall furnish the attorney general with a copy of it and shall request his comments and recommendations.
(B) The governor shall transmit the notice together with his comments and recommendations, if any, and the comments and recommendations of the attorney general, if any, to the next session of the legislature. Unless prior to the expiration of the legislative session to which the notice is transmitted the legislature has adopted a resolution approving the transfer of legislative jurisdiction ... the transfer shall not be effective.
(C) The governor shall cause a duly authenticated copy of the notice and resolution to be recorded in the office of the county clerk of the county where the land or other affected area affected by the transfer of jurisdiction is situated and upon such recordation the transfer of jurisdiction shall take effect."
[14]   *See* supra note 3.
[15]   *Lowe*, 114 U.S. at 534-35, 539; *Dravo*, 302 U.S. at 146-48; *Collins*, 304 U.S. at 528-30; *Kleppe*, 426 U.S. at 542; *Crook*, 54 F. at 610.
[16]   N.M. STAT. ANN. § 19-2-3; supra note 1.

asserted exclusive jurisdiction only over Indians under the Indian Country Crimes Act (ICCA),[17] leaving the state's full legislative jurisdiction over non-Indians intact. Thus, the exclusive jurisdiction of the federal government over Indians on the property has occurred by operation of law. In accord with New Mexico's cession statute, the result is concurrent jurisdiction over the Fort Sill property by the federal and state governments, with both entities empowered to exercise legislative authority.

### B.   Indian Country Not Exclusive Federal Jurisdiction

The division of power under concurrent jurisdiction status is determined by applicable federal and state law. Federal law reserves exclusive power over Indians if the property is determined to be Indian country, but this designation does not disturb the state's legislative powers over non-Indians. Thus, a determination that a land area is Indian country under 18 U.S.C. § 1152[18] does not confer exclusive federal jurisdiction for all purposes or over all persons, especially for criminal law enforcement.

This was best articulated by the Supreme Court in *Surplus Trading Co.*

It is not unusual for the United States to own within a state lands which are set

---

[17]   18 U.S.C. §§ 1152 ("Except as otherwise expressly provided by law, the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country. This section shall not extend to offenses committed by one Indian against the person or property of another Indian, nor to any Indian committing any offense in the Indian country who has been punished by the local law of the tribe, or to any case where, by treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively."); 18 U.S.C. § 1153 ("(a) Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, manslaughter, kidnapping, maiming, a felony under chapter 109A [*18 USCS §§ 2241 et seq*], incest, assault with intent to commit murder, assault with a dangerous weapon, assault resulting in serious bodily injury (as defined in section 1365 of this *title [18 USCS § 1365]*), an assault against an individual who has not attained the age of 16 years, felony child abuse or neglect, arson, burglary, robbery, and a felony under section 661 of this *title [18 USCS § 661]* within the Indian country, shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States. (b) Any offense referred to in subsection (a) of this section that is not defined and punished by Federal law in force within the exclusive jurisdiction of the United States shall be defined and punished in accordance with the laws of the State in which such offense was committed as are in force at the time of such offense.").

[18]   18 U.S.C. § 1151 (Indian Country Defined ...the term "Indian country", as used in this chapter means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.)

> apart and used for public purposes. Such ownership and use without more do not withdraw the lands from the jurisdiction of the State. On the contrary, the lands remain part of her territory and within the operation of her laws, save that the latter cannot affect the title of the United States or embarrass it in using the lands or interfere with its right of disposal .... A typical illustration is found in the usual Indian reservation set apart within a State as a place where the United States may care for its Indian wards.... *Such reservations are part of the State within which they lie and her laws, civil and criminal, have the same force therein as elsewhere within her limits, save that they can have only restricted application to the Indian wards.*"[19]

"The Supreme Court recently confirmed that lands held in trust for the benefit of tribes are not subject to the exclusive jurisdiction of the United States: 'Our cases make clear that the Indians' right to make their own laws and be governed by them does not exclude all state regulatory authority on the reservation. State sovereignty does not end at the reservation's border.'"[20] The *Nevada v. Hicks* Court explained the relationships between federal and state law enforcement in Indian country.

> Ordinarily, it is now clear an Indian reservation is considered part of the territory of the State. ... That is not to say that States may exert the same degree of regulatory authority within a reservation as they do without. To the contrary, the principle that Indians have the right to make their own laws and be governed by them requires 'an accommodation between the interests of the Tribes and the Federal Government, on the one hand, and those of the State, on the other' .... When on-reservation conduct involving only Indians is at issue, state law is generally inapplicable, for the State's regulatory interest is likely to be minimal and federal interest in encouraging tribal self-government is at its strongest.[21]

The Court found that the ICCA, which gives federal courts jurisdiction over various common-law, violent crimes committed by Indians on a reservation within a state in derogation of state jurisdiction, "does not interfere with the process of the State courts within the reservation, nor with the operation of State laws upon white people found there. Its effect is confined to the acts of an Indian of some tribe, of a criminal character, committed within the limits of the reservation."[22] "Sections 1152 and 1153 of Title 18, which give United States and tribal criminal law generally exclusive application, apply only to crimes committed [by and against Indians] *in*

---

[19] *Surplus Trading Co.*, 281 U.S. at 650-51 (emphasis added); *see also Carcieri v. Norton*, 423 F.3d 45 (1st Cir. 2005) (removed from reporter, at Lexis pages 31-33) ("Indian reservations, however, are not federal enclaves.... Such [federal] ownership and use without more do not withdraw the lands from the jurisdiction of the State." (citing *Surplus Trading Co.*)).
[20] *Carcieri*, 423 F.3d at 31-33 (quoting *Nevada v. Hicks*, 533 U.S. 353, 361 (2001) confirmed in the en banc replacement of this panel decision at Carcieri, 497 F.3d 15, 17 (1st Cir. 2007 (Indian reservations are not federal enclaves "because state civil and criminal laws may still have partial application thereon.").
[21] *Nevada v. Hicks*, 533 U.S. at 361-62.
[22] *Id.* at 363 (citing *United States v. Kagama*, 118 U.S. 375, 383 (1886)).

*Indian Country.*"[23]

Therefore, even if a federal property is determined to be Indian country, such a designation does not confer exclusive jurisdiction to the federal government nor does it limit state authority to investigate and prosecute violations of that state's criminal statutes applicable to non-Indians.

    C.    <u>Indian Country</u>

Indian country classification is the benchmark for analyzing federal, tribal, and state authority with respect to Indians in both criminal and civil matters pursuant to the definition in 18 U.S.C. § 1151.[24]

> 'Indian country" ... means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government ... (b) all dependent Indian communities within the borders of the United States whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished....

The applicable subparts of that law to the Fort Sill property are (a) Indian reservations and (b) dependent Indian communities.[25] Federal courts have analyzed tribal trust lands under both subparts, separately or concurrently, and found such property to be Indian country. The federal courts apply the United States Supreme Court test for determining whether or not a property is Indian country codified in § 1151, which is the same for both of these two subparts if the land is not clearly designated a "reservation."[26] The test is whether or not the lands are validly set apart

---

[23]    *Id.* at 365-66 (emphasis in original).
[24]    *Indian Country, U.S.A., Inc. v. Okla.*, 829 F.2d 967 (10th Cir. 1987).
[25]    *See* supra note 18.
[26]    *United States v. Roberts*, 185 F.3d 1125, 1131, 1133 (10th Cir. 1999) *cert. denied*, 529 U.S. 1108 (2000) (noting the unclear distinction between dependent Indian community and informal reservation: "Applying these Supreme Court cases, we believe official 'reservation status is not dispositive and lands owned by the federal government in trust for Indian tribes are Indian country pursuant to 18 U.S.C § 1151.'" Noting that the test announced in *Venetie* "for 18 U.S.C. § 1151(b) Indian Country (dependent Indian community)" corresponds to the factors "articulated in *Potawatomi* establish[ing] Indian Country under 18 U.S.C. §1151 (a) (reservation) when there is no formal reservation. In both instances, the Court looked for federal set aside and superintendence."); *HRI, Inc. v. Envtl. Prot. Agency*, 198 F.3d 1224, 1249-51 (10th Cir. 2000) ("the test for whether land qualifies as Indian country by virtue of its status as a reservation or dependent Indian community is twofold; whether land has been validly set aside by the federal government for the use of Indians; and whether that land is subject to federal supervision ... *Venetie* teaches that there is little difference in substance between the tests under § 1151(a) and § 1151(b)."); *Yankton Sioux Tribe v. Podhradsky*, 529 F. Supp.2d 1040, 1054-56 (D.S.D. 2007).

for Indian use under the superintendence of the federal government.[27] Congress can make

---

[27]     *United States v. John*, 437 U.S. 634, 649 (1978); *Okla. Tax Comm'n v. Citizen Band of Potawatomi Indian Tribe of Okla.*, 498 U.S. 505, 511 (1991) ("the test for determining whether land is Indian country does not turn upon whether that land is denominated 'trust land' or 'reservation'. Rather, we ask whether the area has been 'validly set apart for the use of the Indians as such, under the superintendence of the Government."); *Okla. Tax Comm'n v. Sac & Fox Nation*, 508 U.S. 114, 121-22 (1993) (Congress defines Indian country broadly to include formal and informal reservations and dependent Indian communities); *Alaska v. Native Vill. of Venetie Tribal Gov't*, 522 U.S. 520 (1998) (dependent Indian communities refers to a limited category of Indian lands that are neither reservations nor allotments and that satisfy the two requires of federal superintendence over lands set aside by the Federal Government for the use of the Indians as Indian land. "Our holding is based on our conclusion that in enacting § 1151, Congress codified these two requirements, which previously we had held necessary for a finding of 'Indian country' generally" before § 1151 was enacted); *HRI*, 198 F.3d 1250 (a formal designation of Indian lands as a "reservation" is not required for them to have Indian country status and tribal lands and trust lands generally remain Indian country despite reservation disestablishment); *Ariz. Pub. Serv. Co. v. Envtl. Prot. Agency*, 341 U.S. App. D.C. 222 (D.C. Cir. 2000) (EPA properly interpreted "reservation" to include "trust lands that have been validly set apart for the use of a tribe even though the land has not been formally designated as a reservation" based upon the Supreme Court's definition of "reservation" in *Potawatomi*); *Roberts*, 185 F.3d at 1131 (declaration of reservation status is not necessary for property to be treated as Indian Country under 18 U.S.C. § 1151(a); it is enough that the property has been validly set apart for the use of the Indians under federal superintendence); *S.D. v. United States Dep't of the Interior*, 475 F.3d 993 (8th Cir. 2007) (trust land may properly be categorized as "Indian country." No precedent of the U.S. Supreme Court has ever drawn a distinction between tribal trust land and reservations); *Mustang Prod. Co. v. Harrison*, 94 F.3d 1382 (10th Cir. 1996); *Narragansett Indian Tribe v. Narragansett Elec. Co.*, 89 F.2d 908 (1st Cir. 1996); *Sac & Fox Nation v. Okla. Tax Comm'n*, 967 F.2d 1425 (10th Cir. 1992) *aff'd Okla. Tax Comm'n v. Sac & Fox Nation*, 508 U.S. 114 (1993) (Trust land, validly set apart for Indian use under government supervision qualifies as a reservation); *Tyonek v. Puckett*, 953 F.2d 1179 (9th Cir. 1992); *Indian Country, U.S.A., Inc. v. Oklahoma*, 829 F.2d 967 (10th Cir. 1987); *United States v. Sohappy*, 770 F.2d 816 (9th Cir. 1985) (land held in trust for the benefit of the Indians is a "reservation," at least for the purposes of federal criminal jurisdiction under 18 U.S.C. § 1153 because it meets the principal test for Indian country); *Citizens Against Casino Gambling v. Hogen*, 2008 U.S. Dist. LEXIS 52395 (D.N.Y. 2008) (holding that non-reservation trust land is Indian country because it was validly set apart for the use of Indians under federal superintendence); *Yankton Sioux*, 529 F. Supp.2d at 1056 (if trust land is not found to be reservation under 18 U.S.C. § 1151(a), such trust land qualifies as Indian country under 18 U.S.C. § 1151(b) as a dependent Indian community); *United States v. Papakee*, 485 F.Supp.2d 1032 (D. Iowa 2007) (to determine whether land is categorized as reservation under 18 U.S.C. § 1151(a), the court asks whether the area has been validly set apart for the use of the Indians under superintendence of the government. Trust land can also be considered a "dependent Indian community" because it has been set aside for the use of Indians under federal superintendence of the government.); *United States v. M.C.*, 311 F.Supp.2d 1281 (D.N.M. 2004); *Oneida Indian Nation v. City of Sherrill*, 145 F. Supp.2d 226 (D.N.Y. 2001) (trust land, which is

exceptions and declare that land held in trust is not Indian country[28] or otherwise disestablish reservations and patent allotments such that there are no longer trust lands, Such actions could result in the land in question not being found to be Indian country under the statutory provisions or the Supreme Court test.[29]

---

validly set apart and subject to federal superintendence, qualifies as a reservation); *Ute Indian Tribe v. Utah*, 935 F.Supp. 1473 (D. Utah 1996) (For purposes of 18 U.S.C § 1151(a), Indian tribal trust lands are not a category of Indian country distinct from lands within the limits of any Indian reservation.); *Mustang Fuel Corp. v. Hatch*, 890 F. Supp. 995 (D. Okla. 1995); *United States ex rel. Saginaw Chippewa Tribe v. Mich.*, 882 F.Supp. 659 (D. Mich. 1995).

[28] The exception would be a clear and unequivocal statement of Congress such as occurred with the Indian Cultural Center in Albuquerque. Pub. L. 95-232, 92 Stat. 30, 31 (1978) at (b) ("Such land shall be held in trust jointly for such Indian pueblos and shall enjoy the tax-exempt status of other trust lands, including exemption from State taxation and regulation. However, such property shall not be "Indian country" as defined in section 1151 of title 18, United States Code."). See *Sac and Fox*, 508 U.S. at 123 (Congress must expressly authorize state jurisdiction over Indians in Indian country.); *Cheyenne-Arapaho Tribes of Okla. v. Okla.*, 618 F.2d 665, 668 (10th Cir. 1980) ("We are convinced that, barring possible specific exceptions to which our attention is not directed, <u>lands held in trust by the United States for the Tribes are Indian Country within the meaning of § 1151(a).</u>" citing *John*. (emphasis in original)); *Langley v. Ryder*, 778 F.2d 1092, 1096 (5th Cir. 1985) ("The twenty-acre tract from which the bingo game was operated was taken into trust by the Secretary of the Interior under authority conferred by Congress. As in *John*, the federal government alone could exercise criminal jurisdiction. The only remaining question is whether there has been a "clear and unequivocal grant" of criminal jurisdiction to Louisiana so that the general rule of federal jurisdiction is not applicable."); *Sac & Fox v. Licklider*, 576 F.2d 145, 153 (8th Cir. 1978) (By legislative acts, Congress recognized the state of Iowa's jurisdiction to enforce its fish and game laws on the reservation even though the trust lands in question were found to be Indian country); *Hogen*, 2008 U.S. Dist. Lexis at *113-117, 154 ("Congress need not use express jurisdictional language when it creates Indian lands unless it intends to preserve some aspects of state and local jurisdiction over the land."); *HRI*, 198 F.3d at 1254 ("As we stated in *Cheyenne-Arapaho* ... we remain 'convinced that barring possible specific exceptions...lands held in trust by the United States for the Tribes are Indian Country within the meaning of § 1151(a)'").

[29] *Venetie*, 522 U.S. at 520 (Congress intended that Alaska lands in question would not remain Indian country in its legislative acts by settling the land claims "without creating a reservation system or lengthy wardship or trusteeship."); *Carcieri v. Norton*, 497 F.3d 15, 17 (1st Cir. 2007) (trust acquisition typically results in the removal of the land from state jurisdiction in favor of tribal jurisdiction with federal superintendence unless Congress explicitly grants a request from the state to enforce its laws to the extent not preempted by federal law or by agreement with the tribe. Congress may also limit the Secretary's power "to take lands into trust and thereby create Indian country" but it must do so explicitly); *Murphy v. Simons*, 497 F.Supp.2d 1257, 1292 (E.D. Okla. 2007) ("Indian country" characteristics are extinguished through conveyances to non-Indians); *Wis. v. Stockbridge-Munsee County*, 366 F.Supp.2d 698 (Wis. 2004) (all land within the reservation was subject to fee patents and that upon allotment patenting no trust land would remain).

Some Federal courts find that lands placed in trust for the use of a tribe are equivalent to a "reservation" and therefore qualify as "Indian country" under 18 U.S.C. § 1151(a).[30] The *Azure* case, which dealt with trust lands outside of established reservation boundaries, held that "Indian trust land, although not within the boundaries of the Turtle Mountain Reservation, can be classified as a *de facto* reservation, at least for purposes of federal criminal jurisdiction."[31] Even this "*de facto* reservation" status is not necessary for trust land to be considered Indian country.

---

[30] *John*, 437 U.S. at 648-50 (finding lands placed in trust after purchase by the Tribe, were validly set apart for use of the Indians and as such were under the superintendence of the federal government and therefore equal to a reservation under 18 U.S.C. 1151(a)); *Sac and Fox Nation*, 508 U.S. at 121-22 (the Court did not disagree with the 10th Circuit's conclusion that "there was no difference between trust land validly set apart for Indian use and reservation land and on remand in *Sac and Fox Nation v. Okla. Tax Comm'n*, 7 F.3d 925 (10th Cir. 1993) the 10th Circuit said "The Supreme Court did not reverse the court's affirmance of the district court's analysis of the scope of Indian country" and "we acknowledge that trust land, validly set apart for Indian use under government supervision 'qualifies as a reservation.'"); *Potawatomi*, 498 U.S. at 511 ("Even if a tract of property held by the Federal Government in trust for the benefit of an Indian tribe has not been formally designated as a "reservation," such property qualifies as a "reservation"... because the property has been validly set apart for the use of the Indians as such, under the superintendence of the Government.... Neither *Mescalero* nor any other precedent of this Court has ever drawn the distinction between tribal trust land and reservations that Oklahoma urges... Here, by contrast [with *Mescalero*], the property in question is held by the Federal Government in trust for the benefit of the Potawatomis. As in *John*, we find that this trust land is "validly set apart" and thus qualifies as a reservation for tribal immunity purposes."); *Roberts*, 185 F.3d at 1131 (rejecting tribal chief's argument that trust status alone is not sufficient to establish Indian country); *Buzzard*, 992 F.2d at 1076 (land found not to be Indian country because it was not placed in trust and the restriction against alienation where the title remained with the Tribe did not rise to the level of action required by the federal government to set aside the supervise the land for the use of the Indians); *United States v. Azure*, 801 F.2d 336, 338 (8th Cir. 1986); *HRI*, 198 F.3d at 1249, 1251 ("Under Supreme Court and Tenth Circuit precedent, Trust lands ... are Indian country....We have interpreted Supreme Court precedent as establishing that formal designation as a reservation is not a necessary precondition for land to qualify as Indian country under § 1151(a)."); *Cheyenne-Arapaho*, 618 F.2d at 668 ("We are convinced that, barring possible specific exceptions to which our attention is not directed, <u>lands held in trust by the United States for the Tribes are Indian Country within the meaning of § 1151(a).</u>" citing *John*.); *Langley*, 778 F.2d at 1095-96 ("whether the lands are merely held in trust for the Indians or whether the lands have officially been proclaimed a reservation, the lands are clearly Indian country .... The twenty-acre tract from which the bingo game was operated was taken into trust by the Secretary of the Interior under authority conferred by Congress. As in *John*, the federal government alone could exercise criminal jurisdiction."); *Yankton Sioux*, 529 F. Supp.2d at 1044, 1053-56 (The court agreed with the United States' arguments that 6,000 acres of land taken into trust were "Indian country" under 18 U.S.C. § 1151(a) because the lands constituted an informal or de facto reservation).

[31] *Azure*, 810 F.2d at 339.

Relying on Supreme Court precedent,[32] the Tenth Circuit concluded that lands held in trust by the United States for Indian tribes are Indian country under § 1151.[33]

Several Federal courts have also analyzed the Indian country question for trust lands under 18 U.S.C. § 1151(b).[34] Again, barring an explicit congressional exception, trust lands were found to be Indian country. After completing its analysis under 18 U.S.C § 1151(a), the *Azure* court did a second analysis of the land under the dependent Indian community theory.[35] In that case, although it was difficult to find cohesiveness, the tract certainly "met the other criteria" used by the Eighth Circuit to find a dependent Indian community.[36] The court found that land held in trust was Indian country because the United States retained title, the lands were set apart for use and protection of a dependent Indian people, and the relationship of the tribe to federal government indicated federal supervision.[37] Finding that either 1151(a) or 1151(b) gave the same result, the court did not distinguish which analysis led to the conclusion of Indian country.[38]

---

[32]   Cases cited by the Tenth Circuit include *John*, 437 U.S. at 650 (found that the Major Crimes Act applies for the purposes of federal prosecution of a crime occurring on lands held in trust by the federal government for the benefit of Indians); *Potawatomi*, 498 U.S. at 511 (The state contended that the Potawatomis' cigarette sales did not occur on a "reservation" but only on trust lands. "[No] precedent of this Court has ever drawn the distinction between tribal trust land and reservations that Oklahoma urges....We [have] stated that the test for determining whether land is Indian country does not turn upon whether that land is denominated "trust land" or "reservation." Rather, we ask whether the area has been "'validly set apart for the use of the Indians as such, under the superintendence of the Government.'"); *Okla. Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 453 (1995); and *Sac and Fox Nation*, 508 U.S. at 123.

[33]   *Venetie*, 522 U.S. at 520 (analysis of whether or not a community was Indian country that was not in either trust or reservation status); *Potawatomi*, 498 U.S. at 511; *Roberts*, 185 F.3d at 1131, 1133 ("we believe official "reservation" status is not dispositive and lands owned by the federal government in trust for Indian tribes are Indian Country pursuant to 18 U.S.C. § 1151."). The *Roberts* case found no conflict with its conclusions and the *Venetie* or *Potawatomi* courts because both "looked for federal set aside and superintendence." *See also United States v. M.C.*, 311 F.Supp.2d 1281, 1295 (D.N.M. 2004) (Finding that Fort Wingate land was neither tribal land or land held in trust and was administered by the BIA without any treaty, trust or other obligation to the Navajo Nation or any other Native American group. Thus, it was not Indian country. The court stated "As a review of the case law makes clear, there has never been a finding of a dependent Indian community unless the community at issue was located on tribal lands or land held in trust for Native Americans.).

[34]   *Azure*, 801 F.2d at 339; *HRI*, 198 F.3d at 1224 (a formal designation of Indian lands as a "reservation" is not required for them to have Indian country status and tribal lands, trust lands, and certain allotted lands generally remain Indian country despite reservation disestablishment).

[35]   *Azure*, 801 F.2d at 339.

[36]   *Id.*

[37]   *Id.*

[38]   *Id.*; *see also Yankton Sioux*, 529 F. Supp.2d at 1055 ("To the extent any of the trust land discussed in this opinion would be found ... to not be 'reservation' land, and thus not Indian

11

The very act of placing lands in trust for Indians "can demonstrate both federal set aside and superintendence,"[39] and lead to a finding the land is Indian country with concomitant federal criminal jurisdiction over Indians. The *Buzzard* case found both criteria are satisfied by the government's taking the land into trust. The "set aside" criteria is satisfied when "trust land is set apart for the use of Indians by the federal government because it can be obtained only by filing a request with the Secretary of the Interior, 25 C.F.R. § 151.9 (1992), who must consider, among other things, the Indian's need for the land, *id.* § 151.10(b), and the purposes for which the land will be used, *id.* § 151.10(c)."[40] If the land is placed into trust, "the United States holds the land as trustee. *Id.* § 151.2(d)."[41] The action of federal aside can be accomplished by Congress or by the Bureau of Indian Affairs ("BIA") under its delegated authority.[42]

Superintendency over the land by the government is demonstrated by taking the land into trust because the federal government retains title to the land and regulates activities on the parcel.[43] Also, "before agreeing to acquire trust land, the Secretary must consider several factors including the authority for the transactions, *id.* § 151.10(a), the impact on the state resulting from the removal of the land from the tax rolls, *id.* § 151.10(3), and jurisdictional problems that might arise, *id.* § 151.10(f)."[44] These regulatory procedural requirements "show that, when the federal government agrees to hold land in trust, it is prepared to exert jurisdiction over the land."[45]

There is ample precedent that lands held in trust by the United States for a tribe are Indian country under § 1151 because the federal government has taken the requisite action to set apart

---

country under § 1151(a), the Court finds such trust land would nevertheless qualify as Indian country under § 1151(b0, as a dependent Indian community.").

[39]     *Roberts*, 185 F.2d at 1132; *Buzzard*, 992 F.2d at 1076-77; *Langley*, 778 F.2d at 1095 ("whether the lands are merely held in trust for the Indians or whether the lands have officially been proclaimed a reservation, the lands are clearly Indian country" under § 1151).

[40]     *Buzzard*, 992 F.2d at 1076.

[41]     *Id.*

[42]     *Venetie*, 522 U.S. at 531 n.6 ("some explicit action by Congress (or the Executive, acting under delegated authority) must be taken to create or to recognize Indian country."); *Langley*, 778 F.2d at 1096 ("The twenty-acre tract from which the bingo game was operated was taken into trust by the Secretary of the Interior under authority conferred by Congress."); *Hogen*, 2008 U.S. Dist. Lexis at *159-163 (Tribes cannot unilaterally create Indian country as "There must be an affirmative act by Congress or the Secretary to set the land apart under federal superintendence.").

[43]     Buzzard, 992 F2d at 1076.

[44]     *Id.*

[45]     *Id.* (Superintendency over the land requires the active involvement of the federal government and this "involvement was shown in *McGowan* by the federal government's retention of title to the land and its regulation of activities in the Colony."); *see also United States v. McGowan*, 302 U.S. 535, 538-39 (1938) ("superintendency" of the federal government is found by the courts from the exertion of federal control over the land through laws, regulations, and the "facts of ...[the] case in light of the relationship which has long existed between the Government and the Indians.").

the land for use by the Indians and that the land in question is under federal superintendence.[46] One court said "Circuit Courts have sought to articulate a rationale for what the Supreme Court generally considers self-evident" as it reviewed the numerous cases that have held "non-reservation trust lands are Indian country even though they are not specifically referenced in 25 U.S.C. § 1151 because they are validly set apart for the use of Indians and are under federal

---

[46] *United States v. Pelican*, 232 U.S. 442, 446-49 (1914) (It is not open to controversy that lands being held in trust by the United States and inalienable, "continued to be under the jurisdiction and control of Congress for all governmental purposes, relating to the guardianship and protection of the Indians....the lands ... still retain during the trust period a distinctively Indian character, being devoted to Indian occupancy under the limitations imposed by Federal legislation."); *McGowan*, 302 U.S. at 539, n.17 (the government retained title to the lands which the Indians occupied as a "colony" and has authority to enact regulations and protective laws respecting this territory.); *John*, 437 U.S. at 648-49 ("The ... lands in question here were declared by Congress to be held in trust by the Federal Government for the benefit of the Mississippi Choctaw Indians who were at that time under federal supervision. There is no apparent reason why these lands, which had been purchased in previous years for the aid of those Indians, did not become a "reservation," at least for the purposes of federal criminal jurisdiction at that particular time." The court rejected conducting an analysis under 18 U.S.C. 1151(b) because it found "the first category [reservations] a sufficient basis for the exercise of federal jurisdiction" over these trust lands even though the federal supervision was not continuous); *Venetie*, 522 U.S. at 531 ("our Indian country precedents ... indicate both that the Federal Government must take some action setting apart the land for the use of the Indians 'as such,' and that it is *the land in question*, and not merely the Indian tribe inhabiting it, that must be under the superintendence of the Federal Government.") (emphasis in original); *Sac & Fox v. Licklider*, 576 F.2d 145, 148-50 (8th Cir. 1978) (Land held in trust was a de facto reservation because of the various actions taken by the federal government in relation to the Tribe); *Langley*, 778 F.2d at 1095 (The court found the lands in question were Indian country even though they had not been proclaimed a reservation because the lands met the "reservation" definition of 18 U.S.C. § 1153 and based on the Supreme Court analysis in *John*, which held that lands held in trust by the United States could legally be considered a reservation even if there has been no official proclamation of reservation status using the federal set aside and supervision test.); *Roberts*, 185 F.3d at. 1131, 1133 ("no matter which categorical label we choose to affix" trust land "validly set-aside for the tribe under the superintendence of the federal government" is Indian country); *State of S.D. v. United States. Dep't of the Interior*, 401 F.Supp.2d 1000, 1009 (D.S.D. 2005) .) aff'd *State of S.D. v. U.S. Dep't. of the Interior*, 475 F.3d 993, 999 (8th Cir. 2007) (Distinguishing the note in *United States. v. Strands*, 105 F.3d 1565 (8th Cir. 1997) that "tribal trust land beyond the boundaries of a reservation is ordinarily not Indian country", the court found that "This language, however, is dicta which does not overcome the wealth of legal authority establishing that trust land qualifies as "Indian country." citing *Potawatomi*, 498 U.S. at 511; *Roberts, 185 F.3d at 1131*; *Buzzard, 992 F.2d at 1076*; and *Azure, 801 F.2d at 338*; *Carcieri v, Norton*, 497 F.3d 15, 20-21 (1st Cir. 2007) ("The Secretary's acquisition of land into trust for Indians results in the land becoming 'Indian country."); *Hogen*, 2008 U.S. Dist. Lexis at *113-14 ("Courts have long held that non-reservation trust lands are Indian country even though they are not specifically referenced in 25 U.S.C. § 1151 because they are validly set apart for the use of Indians and are under federal superintendence.").

13

superintendence."[47] We could find no situation where land held in trust was not found to be Indian country pursuant to § 1151, absent an explicit congressional exception.

### D. Fort Sill Is Indian Country

The 2002 Trust Deed of the Fort Sill property to the United States for the benefit of the Fort Sill Apache Tribe may be considered under the case law to be a "setting aside" of the property for the Indians. The federal government holds title to the property and controls the land, satisfying the superintendence requirement to designate a tract Indian country under § 1151. The property cannot be sold to non-Indians or committed to non-Indian use and is held for the sole benefit of the Fort Sill Apache Tribe. The Trust Deed and subsequent management actions by the Bureau of Indian Affairs shows the land was set apart for the Tribe and that it exerts federal superintendency over the property.[48] The federal government continues to apply federal laws and regulations to the Fort Sill property, including restraints on encumbrances of Indian lands pursuant to 25 U.S.C. § 81 and 25 C.F.R. Part 84.

Based upon the continuing federal superintendency of the Fort Sill property, federal actions to set apart the property for the benefit of the Fort Sill Apache Tribe, and the taking of the land into trust by the United States for the benefit of the Tribe, it is our opinion that the Fort Sill property is Indian country under 18 U.S.C. § 1151(a) or 18 U.S.C. § 1151(b). Thus, federal jurisdiction over the property can be established under 18 U.S.C. § 1153, which provides for federal prosecution of certain offenses committed within Indian country.[49]

As in *Roberts*, the United States here "retains title to the property; the state considers the property to be beyond its taxation jurisdiction; the BIA Area Director approved the land acquisition; the government continues to oversee the Tribal Complex property;" and the BIA and Fort Sill Apache Nation treat the trust property as reservation lands.[50] The 2002 action of taking the land into trust had the legal effect of making the Fort Sill property Indian country. If the property is declared "reservation" it will squarely fit the text of the statute.[51]

---

[47] *Hogen*, 2008 U.S. Dist. Lexis at *113-117, 154 (no "magic words" are required to create Indian country, but placing the land in trust status is enough).

[48] Memorandum from Regional Director, BIA, to Director Trust Responsibilities, Div. of Real Estate Serv., BIA 1, 4 (Oct. 12, 2006) ("This land is being treated and administered by the Bureau as reservation land."); Memorandum from Fort Sill-Ciricahua-Warm Springs-Apache Tribe, to United States Bureau of Indian Affairs, Albuquerque Area Office, Branch of Real Estate Services, Application to Request Land be Taken into Trust in Luna County, New Mexico 2 (Dec. 8, 1999) ("any future change in use on that property will more than likely require some level of review by the BIA for a contract or lease approval...").

[49] *M.C.*, 311 F.Supp2d at 1295.

[50] *Roberts*, 185 F.3d 1125. at 1134-35.

[51] *John*, 437 U.S. at 649 ("if there were any doubt" about the land being Indian country when it was held in trust, when Congress declared a reservation, "the situation was completely clarified."); *Oneida Indian Nation v. City of Sherrill*, 145 F. Supp.2d 226 (D.N.Y. 2001) (the set aside and superintendence requirements are inherent to a validly established reservation and need not be separately proven to support a finding that reservation is Indian country—nothing can be

V.   CONCLUSION

The 30 acres of land taken into trust for the Fort Sill Apache Tribe is Indian country under 18 U.S.C. § 1151. Therefore, the United States and the Tribe have exclusive criminal jurisdiction over Indians on the property. The State of New Mexico has concurrent criminal jurisdiction with the United States over non-Indians at the Fort Sill property because it was acquired after 1940 and no attempt has been made by the United States to seek exclusive jurisdiction under current New Mexico law. A finding that the property is Indian country does not confer exclusive jurisdiction to the United States. This opinion does not make any conclusions with regard to the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701-21.



---

more appropriately deemed Indian country than a tract of land designated as an Indian reservation").