

## Memorandum

Date:     May 19, 2008

To:       Philip N. Hogen, Chairman

From:     Penny J. Coleman, Acting General Counsel

Re:       Ft. Sill Apache Tribe Luna Co., NM Property

**Introduction**

Chairman Houser informed the General Counsel at a meeting in Scottsdale, Arizona, on January 16, 2008, that the Ft. Sill Apache Tribe (Tribe) planned to open a new Class II gaming operation on trust lands, known as Akela Flats, in Luna County, New Mexico. Chairman Houser expressed concern about the potential applicability of new National Indian Gaming Commission (NIGC) facility license regulations which were scheduled to become effective on March 3, 2008. The regulations require a tribe to notify the NIGC 120 days in advance of its plans to license a new facility. Although I assured the Tribe that the NIGC would work with the Tribe to diminish any adverse consequences of the 120 day rule, the Tribe apparently attempted to open its gaming facility at Akela Flats on February 28, 2008. It did not do so however.

On March 10, 2008, the Tribe submitted an amended gaming ordinance for the Chairman's consideration. The amended gaming ordinance is site specific and the Tribe's goal in submitting the amendment is to attain final agency action. As a result, the Office of General Counsel has worked with all due diligence to review the Tribe's claims that it is entitled to operate gaming on its New Mexico property pursuant to the Indian Gaming Regulatory Act (IGRA). As detailed below, we conclude that the NM property does not qualify for gaming under IGRA.

On February 22, 2008, the Fort Sill Apache Tribe (Tribe) submitted its analysis that the Tribe's trust land located in Luna County, New Mexico, is Indian lands upon which it may lawfully game pursuant to IGRA. 25 U.S.C. § 2701 *et seq.* Specifically, the Tribe asserted that the land satisfies the "last recognized reservation" exception, 25 U.S.C. § 2719(a)(2)(B), and the "restored lands" exception, 25 U.S.C. § 2719(b)(1)(B)(iii). In

addition, the Tribe indicated that it also wishes to claim the "initial reservation" exception.[1]  25 U.S.C. § 2719(b)(1)(B)(ii).

**The Land Acquisition**

On October 23, 1998, the Tribe acquired approximately thirty (30) acres of land in fee, in Luna County, New Mexico. The legal description of the land known as Akela Flats follows:

> That part of the North half (NH) of Section Eleven (11), lying North of the Interstate 10 right-of-way, Township Twenty-four (24) south, Range Six (6) west, N.M.P.M., Luna County, New Mexico, being described as follows: Beginning at a spike in the center of an abandoned asphalt roadway at the Northeast corner of said Section Eleven (11) and Northeast corner of this tract; Thence S0°21'53"W., along the east line of Section Eleven (11), a distance of 500.76 feet to a no. 5 steel rod at the Southeast corner of this tract and on the North boundary of the Interstate 10 right-of-way; Thence adjoining the North boundary of said I-10 right-of-way through the following courses and distances; along a curve to the left from a tangent which bears N.89°56'18"W., having a radius of 789.30 feet, a delta angle of 32°47'40", a cord which bears S.73°39'52"W., 445.63 feet through an arc length of 451.77 feet to I-10 P.C. marker 10+30.62; Thence S.57°12'44"W., a distance of 231.01 feet to I-10 P.T. marker 8+00; Thence along a curve to the right from a tangent which bears S.57°16'18"W., having a radius of 1096.00 feet, a delta angle of 39°58'50", a cord which bears S.77°15'43"W., 749.36 feet through an arc length of 764.78 feet to I-10 P.C. marker 45+11.53; Thence N.82°45'27"W., a distance of 340.58 feet to a no. 5 steel rod at the Southwest corner of this tract; Thence N.0°21'53"E., along a line parallel with the east line of Section Eleven (11), a distance of 871.49 feet to a no. 5 steel rod at the Northwest corner of this tract; Thence N.89°55'55"E.,

---

[1] On February 25, 2008, Richard Grellner, an attorney representing the Tribe, sent an e-mail to Staff Attorney Esther Dittler, expressing the Tribe's intention to claim the settlement of a land claim exception. 25 U.S.C. § 2719 (b)(1)(B)(i). The Tribe has submitted no other information supporting this exception. The Tribe might have argued that it settled a land claim in *Comanche Nation v. United States of America*. The resolution of that case is embodied in the Agreement of Compromise and Settlement Recitals that was executed on January 9, 2007 *See Comanche Nation v. United States of America*, Agreement of Compromise and Settlement Recitals, CIV-05-328-F at 7(i) (W.D.OK, March 8, 2007). The land, however, was taken into trust on July 23, 2001 which was several years before the Tribe filed its complaint in *Comanche Nation* and prior to the execution of the settlement. The settlement of a land claim exception requires that land be taken into trust as part of a settlement of a land claim. As the land was taken into trust prior to the date the settlement was executed, this exception is not applicable.

along the North line of Section Eleven (11), a distance of 1688.27 feet to the point of beginning.[2]

Initially, the Tribe requested that the Bureau of Indian Affairs (BIA) take the land into trust under 25 C.F.R. Part 151 and Section 20 of the IGRA. However, the Governor of New Mexico declined to concur with the Tribe's request.[3] The Tribe reconsidered the use of the land, passing a resolution that its use would not change. At that time, the land known as Akela Flats was vacant and undeveloped. *See* Tribal Council Resolution No. FSAABC-2000-19 (Feb. 15, 2000).

On July 23, 2001, the BIA issued a trust acquisition approval letter. In approving the acquisition the BIA noted that:

> The acquisition was in the best interest of the Fort Sill Apache of Oklahoma thereby promoting tribal self-determination and land for reestablishment of the Tribe's land base in New Mexico. The Tribe stated the purposes for which this land will be used are for a land base to reestablish its presence in its aboriginal and former reservation territories in New Mexico. No development is proposed at this time. By letter dated April 21, 1999, the Tribal Planner transmitted a copy of Tribal Council Resolution No. FSABC-99-14 dated April 20, 1999, and advised that through this Resolution the Tribe was removing gaming as a purpose for this acquisition. Based upon these statements, I also make a <u>finding</u> that this acquisition <u>is not for gaming purposes.</u> Therefore, I am signing this **letter of intent** to take the Akela property into trust status for the Fort Sill Apache Tribe of Oklahoma.

*See* Letter from Ethel Abeita, Acting Regional Director of BIA to Ruey Darrow, Chairwoman of the Fort Sill Apache Tribe of Oklahoma (July 23, 2001) (emphasis in original).

**Applicable Law**

For tribes to conduct gaming under IGRA, such gaming must be conducted on "Indian lands," defined as:

(A) all lands within the limits of any Indian reservation; and

---

[2] *See* Warranty Deed between the Schoeppner Family Trust and the Fort Sill Apache Tribe (October 23, 1998).
[3] *See* Letter from Gary Johnson, Governor, State of New Mexico, to Robert Baracker, Area Director, Bureau of Indian Affairs (April 1, 1999).

> (B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United State against alienation and over which an Indian tribe exercises governmental power.

25 U.S.C. § 2703(4). *See also* 25 C.F.R. § 502.12 (NIGC's implementing regulation further defining Indian lands).

The land at issue here is not within a present day reservation. Thus, for trust or lands subject to a restriction to qualify as Indian lands, a Tribe must present evidence that it exercises governmental power over the land at issue. Prior to answering that question, however, we must consider the Tribe's jurisdiction over the land, as a tribe must possess theoretical and actual jurisdiction to enable it to exercise governmental power over a parcel of land.

### Jurisdiction and the Exercise of Governmental Power

### A. Jurisdiction

As stated before, tribal jurisdiction is a threshold requirement to the exercise of governmental power. *See e.g., Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 701-703 (1st Cir. 1994), *cert. denied*, 513 U.S. 919 (1994), *superseded by statute as stated in Narragansett Indian Tribe v. National Indian Gaming Commission*, 158 F.3d 1335 (D.C. Cir. 1998) ("In addition to having jurisdiction, a tribe must exercise governmental power in order to trigger [IGRA]"); *Miami Tribe of Oklahoma v. United States*, 5 F. Supp. 2d 1213, 1217-18 (D. Kan. 1998) (*Miami II*) (a tribe must have jurisdiction in order to be able to exercise governmental power); *Miami Tribe of Oklahoma v. United States*, 927 F. Supp. 1419, 1423 (D. Kan. 1996) (*Miami I*) ("the NIGC implicitly decided that in order to exercise governmental power for purposes of 25 U.S.C. § 2703(4), a tribe must first have jurisdiction over the land"); *State ex. rel. Graves v. United States*, 86 F. Supp. 2d 1094 (D. Kan. 2000), *aff'd and remanded sub nom., Kansas v. United States*, 249 F.3d 1213 (10th Cir. 2001). This interpretation is consistent with IGRA's language limiting the applicability of its key provisions to "[a]ny Indian tribe having jurisdiction over Indian lands," or to "Indian lands within such tribe's jurisdiction." 25 U.S.C. §§ 2710(d)(3)(A), 2710(b)(1)); *see also Narragansett Indian Tribe*, 19 F.3d at 701-703. As a threshold matter, we must therefore analyze whether the Tribe possesses jurisdiction over the trust parcel.

Generally speaking, an Indian tribe possess jurisdiction over land that the tribe inhabits if the land qualifies as "Indian country." *Alaska v. Native Village of Venetie Tribal Gov't*, 522 U.S. 520, 527 n.1 (1998). Congress defined the term "Indian country" as: "(a) all land within the limits of any Indian reservation . . . , (b) all dependent Indian communities . . . , and (c) all Indian allotments, the Indian titles to which have not been

4

extinguished . . . ." 18 U.S.C. § 1151. Although this definition applies directly only to federal criminal jurisdiction, the courts have also generally applied this definition to questions of civil jurisdiction. *Venetie*, 522 U.S. at 527.

In its review of 18 U.S.C. § 1151, the *Venetie* court found that the statute contains two of the indicia previously used to determine what lands constitute "Indian Country": (1) lands set aside for Indians and (2) Federal superintendence of those lands. *See Venetie*, 522 U.S. at 527. In *Venetie*, the court observed that Section 1151 reflects the two criteria the Supreme Court previously held necessary for a finding of "Indian Country." 522 U.S. at 527. Further, reservation status is not necessary for a finding of "Indian Country."[4]

The Tenth Circuit found that "[o]fficial designation of reservation status is not necessary for the property to be treated as Indian Country under 18 U.S.C. § 1151," rather, "it is enough that the property has been validly set aside for the use of the Indians, under federal superintendence." *United States v. Roberts*, 185 F.3d 1125, 1133, n.4 (10th Cir. 1999). Further, "reservation status is not dispositive and lands owned by the federal government in trust for Indian tribes are Indian Country pursuant to 18 U.S.C. § 1151." *Roberts*, 185 F.3d at 1130. Thus, as long as the land in question is in trust, the courts make no distinction between the types of trust lands that can be considered "Indian Country." *Roberts*, 185 F.3d at 1131, n.4. Accordingly, lands held in trust, fee simple restricted status, allotments and reservations are all considered "Indian Country."[5] Consistent with the Supreme Court decisions discussed above, Akela Flats qualifies as "Indian country," because the land has been validly set-aside for the Tribe under the superintendence of the Federal government. Because the land is Indian country held in trust for the Tribe, we conclude that the Tribe has jurisdiction over it.

## B. Governmental Power on Non-Reservation Trust Land

Next we look to whether the Tribe exercises governmental power over Akela Flats. *See* 25 U.S.C. § 2703(4)(B); *see also Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 703 (1st Cir. 1994).

IGRA is silent as to how NIGC is to decide whether a tribe exercises governmental power over lands at issue. Furthermore, the manifestation of governmental power can differ dramatically depending upon the circumstances. For this reason, the NIGC has not formulated a uniform definition of "exercise of governmental power," but rather decides that question in each case based upon all the circumstances. *See* National Indian Gaming Commission: Definitions Under the Indian Gaming Regulatory Act, 57 Fed. Reg. 12382,

---

[4] *See Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 498 U.S. 505, 511 (1991) ("No precedent of this Court has ever drawn the distinction between tribal trust land and reservation that Oklahoma urges.")

[5] *See United States v. Sandoval*, 231 U.S. 28 (1913) (fee restricted land as Indian Country); *United States v. Pelican*, 232 U.S. 442 (1914) (allotment as Indian Country); *United States v. McGowan*, 302 U.S. 535 (1938) (trust land as Indian Country).

12388 (1992). Caselaw provides some guidance. The First Circuit in *Narragansett Indian Tribe* found that satisfying this requirement depends "upon the presence of concrete manifestations of [governmental] authority." 19 F.3d at 703. Such examples include the establishment of a housing authority, administration of health care programs, job training, public safety, conservation, and other governmental programs. *Id.*

In *Cheyenne River Sioux Tribe v. State of South Dakota*, 830 F. Supp. 523 (D.S.D. 1993), *aff'd*, 3 F.3d 273 (8th Cir. 1993), the court stated that several factors might be relevant to a determination of whether off-reservation trust lands constitute Indian lands. The factors were:

(1) Whether the areas are developed;

(2) Whether the tribal members reside in those areas;

(3) Whether any governmental services are provided and by whom;

(4) Whether law enforcement on the lands in question is provided by the Tribe; and

(5) Other indicia as to who exercises governmental power over those areas.

*Id.* at 528.

In this matter, the Tribe has identified several actions that demonstrate its present exercise of governmental power over Akela Flats. Specifically, the following actions are significant:

(1) The Tribe has fenced off the land;

(2) The Tribe has begun construction of a gaming facility on the site;

(3) The Tribe has issued a facility license to the gaming facility; and

(4) The Tribe is in the process of improving the roads on the site.

These actions constitute "concrete manifestations of governmental authority" over Akela Flats. Therefore, the Tribe exercises governmental power over Akela Flats.

**Application of 25 U.S.C. § 2719**

A determination of whether a tribe is exercising governmental powers over the subject parcel, however, is not necessarily the end of the inquiry. IGRA generally prohibits gaming on lands acquired in trust after October 17, 1998, unless one of the statute's

exceptions apply. 25 U.S.C. § 2719. Accordingly, for lands taken into trust after October 17, 1988, it is necessary to review the prohibition and its exceptions to determine whether a tribe can conduct gaming on such lands.

The Tribe alleges that the land at issue qualifies for IGRA's last recognized reservation exception and its restored lands exception. The last recognized reservation exception allows gaming on Indian lands acquired in trust after October 17, 1988, if the Indian tribe has no reservation on the October 17, 1988, and "such lands are located in a State other than Oklahoma and are within the Indian tribe's last recognized reservation within the State or States within which such Indian tribe is presently located." 25 U.S.C. § 2719(a)(2)(B). The restored lands exception allows gaming on Indian lands acquired in trust after October 17, 1988, if the lands are taken into trust as part of the "restoration of lands for an Indian tribe that is restored to Federal recognition." 25 U.S.C. § 2719(b)(1)(B)(iii). The Tribe also claims that the land satisfies the "initial reservation" exception which allows gaming on Indian lands taken into trust as part of a tribe's "initial reservation of an Indian tribe acknowledged by the Secretary under the Federal acknowledgment process." 25 U.S.C. § 2719(b)(1)(B)(ii).

## I. Last Recognized Reservation

The last recognized reservation exception allows gaming on Indian lands acquired in trust after October 17, 1988, if the Indian tribe had no reservation as of October 17, 1988, and "such lands are located in a State other than Oklahoma and are within the Indian tribe's last recognized reservation within the State or States within which such Indian tribe is presently located." 25 U.S.C. § 2719(a)(2)(B). The first two parts of this exception are met: the Tribe had no reservation on October 17, 1988, and the land is in New Mexico, a state other than Oklahoma. We now consider to whether Akela Flats is within the State or States within which the Tribe is presently located and whether Akela Flats is within the Tribe's last recognized reservation.

IGRA does not define "presently located." Whether the Tribe is "presently located" in New Mexico turns on the scope and meaning of the term "presently located." To determine the scope of a statute, we look first to its language. *Reves v. Ernest & Young*, 507 U.S. 170, 177 (1993). To ascertain the plain meaning of a statute we look to the particular statutory language at issue, as well as the language and design of the statute as a whole. *Kmart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988); (*See also, U.S. v. Seminole Nation of Oklahoma*, 321 F.3d 939, 944 (10th Cir. 2002), "In interpreting a statute, the [Tenth Circuit] gives effect to a statute's unambiguous terms. In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole.") Furthermore, we must give the words of the statute "their ordinary, contemporary, common meaning, absent an indication Congress intended them to bear some different import." *Williams v. Taylor*, 529 U.S. 420, 432 (2000).

The NIGC has defined "presently located" to mean where a tribe physically resides, and "to determine where this is the NIGC looks to the seat of tribal government and population center." *Wyandotte Nation v. National Indian Gaming Commission*, 437 F.Supp.2d 1193, 1205 (Kansas 2006). The *Wyandotte* court, however, accepted a less restrictive definition of "presently located." It concluded that a tribe is presently located where "a tribe has its population center and major governmental presence." *Id.* at 1206. We conclude that under either test, the Tribe is not presently located in the State of New Mexico.

## A. Seat of Tribal Government and Population Center

To determine where the Tribe is located, we first consider the location of the Tribe's seat of government and the location of the Tribe's population center. The Tribe meets neither test.

The Tribe argues that it is presently located in New Mexico because the Tribe has:

1. expressed its intent to repatriate back to the State;

2. received correspondence from the Governor in which the Governor expressed his support of the Tribe's effort to return to the State;

3. purchased Akela Flats in 1998 and Akela Flats was taken into trust;

4. submitted an application requesting a Reservation Proclamation be issued;

5. allegedly opened tribal offices at Akela Flats and is administering programs to its tribal members from that location;

6. sought to purchase additional land within the New Mexico;

7. entered into discussions with the Bureau of Land management regarding taking over the conservancy of protected sites in Dona Ana County, New Mexico;

8. received numerous communications from Federal, State, and local agencies seeking the Tribe's participation, comments on, or consultation regarding projects or actions throughout the Tribe's former reservation in New Mexico;

9. asserted that individuals who are now members of the Mescalero Apache Tribe may qualify for membership to the Tribe if they choose to revoke their Mescalero Apache membership;

10. asserted that thirty current members of the Tribe live in New Mexico;

11. provides educational program benefits and per capita payments to all members, including those members that reside in New Mexico; and

12. conducted elections in which any member may participate through mail-in ballot, including those members who reside in New Mexico.

The Tribe's governmental headquarters is located in Apache, Oklahoma. *See* Memorandum of Support of Fort Sill Apache Tribal Gaming Commission Luna County, New Mexico Gaming License, page 10 (Feb. 22, 2008). On March 27, 2008, the Tribe passed resolutions transferring several of its tribal programs to the Tribe's New Mexico Office. The following programs were allegedly transferred:

1) Section 106 Consultation Program;

2) Cultural Resource Management Program;

3) Native American Graves Protection and Repatriation Act Program;

4) Environmental Protection Agency Program; and

5) Higher Education Program.

*See* Fort Sill Apache Business Committee Resolution Number FSABC-2008-15; FSABC-2008-16; FSABC-2008-17; FSABC-2008-118; FSABC-2008-19. In addition, the Tribe may have also relocated its per capita program to New Mexico. While the Tribe may have authorized the transfer of these programs, the Tribe did not submit any evidence that these programs are presently administered from the site. Moreover, the transfer of several tribal programs does not equate to the establishment of the seat of tribal government in New Mexico. Thus, the seat of the Tribe's government remains in Apache, Oklahoma.

The Tribe has not demonstrated that its population center is located in New Mexico. The Tribe notes that half of the Tribe's members live outside the State of Oklahoma and that this resulted from the Tribe's lack of an adequate land base in Apache, Oklahoma. The Tribe also acknowledges that its tribal rolls do not reflect a large number of members in New Mexico. The Tribe's current tribal membership roll indicates that the Tribe has approximately 635 enrolled members. *See* Letter from Phillip Thompson, Attorney for Fort Sill Apache Tribe, to Esther Dittler, Staff Attorney, NIGC, Enclosure 10 (April 7, 2008). Approximately two hundred ninety seven (297) tribal members, forty-seven percent (47%), live in Oklahoma. *Id.* By contrast, approximately twenty six (26) tribal members, four percent (4%), live in New Mexico. *Id.*

The tribal membership rolls demonstrate that a majority of the Tribe's membership is disbursed over a great many states.

Figure 1:  Fort Sill Apache Location of Enrolled Tribal Members by State[6]

| State or Other Location | Number of Tribal Members Residing in State or Location | Number of Tribal Members Residing in State as a Percent |
|---|---|---|
| Oklahoma | 297 | 47% |
| Texas | 59 | 9% |
| California | 46 | 7% |
| Kansas | 40 | 6% |
| Arizona | 31 | 5% |
| New Mexico | 26 | 4% |
| Illinois | 17 | 3% |
| Arkansas | 14 | 2% |
| Montana | 13 | 2% |
| Colorado | 8 | 1% |
| Tennessee | 8 | 1% |
| Washington | 8 | 1% |
| Kentucky | 7 | 1% |
| Iowa | 6 | 1% |
| Maryland | 6 | 1% |
| Nevada | 4 | 1% |
| Utah | 4 | 1% |
| Virginia | 4 | 1% |
| Florida | 3 | <1% |
| Georgia | 3 | <1% |
| Louisiana | 3 | <1% |
| Massachusetts | 3 | <1% |
| Mississippi | 3 | <1% |
| South Carolina | 3 | <1% |
| Indiana | 2 | <1% |
| North Carolina | 2 | <1% |
| Connecticut | 1 | <1% |
| Montana | 1 | <1% |
| Nebraska | 1 | <1% |
| New York | 1 | <1% |
| Ohio | 1 | <1% |
| Oregon | 1 | <1% |
| Pennsylvania | 1 | <1% |
| Wisconsin | 1 | <1% |
| Puerto Rico | 4 | 1% |
| England | 1 | <1% |

[6] Data Source: Letter from Phillip Thompson, Attorney for Fort Sill Apache Tribe, to Esther Dittler, Staff Attorney, NIGC, Present Tribal Membership Roll - Enclosure 10 (April 7, 2008).

10

| | | |
|---|---|---|
| Military | 2 | < 1% |
| Total | 628 | |

The Tribe notes that there are an undetermined number of individuals who are now members of the Mescalero Apache Tribe, some of whom may qualify for membership in the Tribe if they chose to renounce their Mescalero Apache membership. Potential tribal members, by definition, are not members of the Tribe; therefore, such individuals are not properly considered in this analysis. The approximately twenty six (26) tribal members who reside in New Mexico do not represent the Tribe's population center. *Wyandotte Nation v. National Indian Gaming Commission*, 437 F.Supp.2d 1193,1207 (Kansas 2006) (rejecting the assertion that approximately 100 members residing in the county constitutes a population center).

Consequently, the Tribe's population center is clearly located in Oklahoma. Furthermore, the Tribe's seat of government is in Apache, Oklahoma.

### B. Major Governmental Presence and Population Center

Some tribes have reservations that span more than one state. (*e.g.* the Navajo Nation's reservation spans the borders of Arizona, New Mexico, and Utah). In such a case, a tribe may be "presently located" in more than one state, that is, the Tribe may be presently located in "states." 25 U.S.C. § 2719(a)(2)(B). Although it is possible for a tribe to have more than one seat of government (e.g., the Seneca Nation's seat of government rotates between two reservations), generally a Tribe has only one seat of government. If the NIGC applied the seat of tribal government test in circumstances where a tribe's former reservation spanned more than one state, any tribe with one seat of government would be precluded from gaming on at least part of its last recognized reservation, and we would have failed to give effect to the term "states" within the meaning of 25 U.S.C. § 2719(a)(2)(B).

However, while a tribe that may be located in more than one state and may have one seat of government, generally, the tribe will maintain a major governmental presence in the states through the provision of services to tribal members. Therefore, in circumstances where a tribe's last recognized reservation spans more than one state, and in order to give effect to the term "states," the NIGC looks to a tribe's population center and for a "major governmental presence." Where statutory language is ambiguous, a court will defer to the NIGC's reasonable interpretation of the language. *U.S. v. Seminole Nation of Oklahoma*, 321 F.3d 939, 944 (10th Cir. 2002). In *Wyandotte Nation*, the District Court for the District of Kansas found that a review based upon population center and major governmental presence was a "reasonable interpretation in light of the plain meaning of the phrase presently located, and adopt[ed] the same." *Wyandotte Nation v. NIGC*, 437 F.Supp.2d 1193, 1206 (2006).

11

The Tribe has not demonstrated that it has a "major governmental presence" in New Mexico. An expression of intent to repatriate back to the State, correspondence from the Governor expressing his support of the Tribe's effort to return to the State, purchase of the land at issue and subsequent trust acquisition, the submission of an application requesting a Reservation Proclamation, and the Tribe's effort to purchase additional land within the New Mexico simply do not demonstrate a major governmental presence in New Mexico.

The Tribe also asserts that it has opened tribal offices on the land at issue and is administering programs to its tribal members from that location. Based on observations made by NIGC field staff, there are no tribal offices on the site and no programs being administered on the site. As mentioned above, the Tribe recently authorized the transfer of several tribal programs to New Mexico. While the Tribe may have authorized the transfer of these programs, we have no evidence that any programs are presently being administered from the site.

The Tribe further asserts that it has a governmental presence in New Mexico through the provision of certain services to members who live in the state. The Tribe's government is located in Apache, Oklahoma, and it permits tribal members to participate in various tribal programs through the mail. Specifically, the Tribe permits its members to participate in its education programs, distributes per capita payments, and conducts elections through the mail. These activities instead of establishing a governmental presence in New Mexico, establish that the Tribe is exercising its governmental power from the State of Oklahoma.

Further, the Tribe has indicated that it has entered into discussions with the Bureau of Land management regarding taking over the conservancy of protected sites in Dona Ana County, New Mexico, and suggests that this contributes to the Tribe's presence in the State. The Tribe has not asserted that it is currently acting as the conservator for these sites; therefore, these discussions do not support the claim of a major governmental presence within the State.

In addition, the Tribe notes that it received numerous communications from Federal, State, and local agencies seeking the Tribe's participation, comment, or consultation regarding projects or actions in New Mexico, including one letter from the Department of the Interior, Bureau of Indian Affairs, providing the Tribe with notice and an opportunity to comment on a two-part determination for the Pueblo of Jemez pursuant to the exception contained in 25 U.S.C. § 2719(b)(1)(a).[7] The Tribe suggests that these communications represent the acknowledgement of the various governmental agencies of the Tribe's physical presence in New Mexico. At most, these communications acknowledge the Tribe's potential interest in the proposed action. In particular, Section

---

[7] We note that this correspondence was sent to the Tribe's governmental headquarters in Oklahoma.

12

20 of IGRA requires the Secretary of the Interior to consult with any "nearby Indian tribe" while considering a two-part determination. The Secretary has not yet adopted a definition for "nearby Indian tribe." However, the Secretary has published a proposed definition for "nearby Indian tribe." Under the proposed definition:

> Nearby Indian tribe means an Indian tribe with tribal Indian lands, as defined in 25 U.S.C. 2703(4) of IGRA, located within a 25-mile radius of the location of the proposed gaming establishment, or if the tribe is landless, within a 25-mile radius of its governmental headquarters.

Gaming on Trust Lands Acquired After October 17, 1988, 71 Fed. Reg. 58769 (Oct. 5, 2006) (to be codified at 25 C.F.R. pt. 292). Similar to the other requests for comment or consultation, the Secretary's notice and request for comment acknowledge that the Tribe holds Indian lands in New Mexico and is not an acknowledgement that the Tribe is "presently located" in New Mexico as contemplated by 25 U.S.C. § 2719(a)(2)(B) or is eligible to game on such lands under § 2719.

Taken together, the actions taken by the Tribe establish that it is exercising its governmental power from the State of Oklahoma and that, at best, its governmental presence in New Mexico is limited. Therefore, the Tribe has not established that it has a "major governmental presence" in New Mexico, or, as noted above, that its population center is located in New Mexico.

### C. The Tribe failed to show that the parcel is located within its last recognized reservation.

The Tribe has failed to demonstrate that the land it intends to game on is "within the Indian tribe's last recognized reservation . . . ." 25 U.S.C. § 2719(a)(2)(B). The Tribe failed to show that any land was designated a reservation for its benefit in New Mexico, let alone that Akela Flats was part of it. Letter from Phillip Thompson, Attorney for Fort Sill Apache Tribe, to Esther Dittler, Staff Attorney, NIGC, 6 (April 7, 2008). The Tribe states:

> In New Mexico, the only reservation which may have been designated for the Chiricahua or Warm Springs Apaches was the Hot Springs Reservation. . . The Executive Order establishing the Hot Springs Reservations mentions the Southern Apaches. The Souther [sic] Apaches [however] is not a designation used to describe the Tribe in the ICC opinions.

*Id.* at 6.

The Fort Sill Apache was found to be the successor-of-interest of the Chiricahua and Warm Springs Apache Bands. *Fort Sill Apache Tribe v. United States*, 19 Ind. Cl. Comm.

13

212, 215 (June 28, 1968). As the Tribe indicated, the ICC opinion did not specifically find that Southern Apache was a designation used to describe the Tribe. Therefore, it has no claim to the Warm Springs reservation.

Alternatively, the Tribe claims that its last recognized reservation is the land described in Finding of Fact 13(a) of the case *Fort Sill Apache Tribe v. United States,* 19 Ind. Cl. Comm. 212, at 241-242. The land defined in that case encompasses Akela Flats because it encompasses half of Arizona, half of New Mexico, and part of Mexico. The Tribe wants to claim that this entire area constitutes a reservation, and thus Akela Flats is part of the last recognized reservation. However, Finding of Fact 13(a) designates the lands to which the Tribe held aboriginal title as of September 4, 1886 and does not connote a reservation. *Id.* at 241.

Many definitions exist for what constitutes a reservation. Reservation originally meant any land reserved from a Tribe's cession of aboriginal territory. *See* F. Cohen, *Handbook on Federal Indian Law*, note 3 at 34 (1982 ed.). Over the years a number of definitions have arisen in Indian law including the following:

> Reservation includes Indian reservations, public domain Indian allotments, former Indian reservations in Oklahoma, and land held by incorporated Native groups, regional corporations, and village corporations under the provisions of the Alaska Native Claims Settlement Act [43 U.S.C. 1601 et seq.].

25 U.S.C. § 1452(d). Another definition of reservation is that:

> Reservation means, for purposes of this part, that area of land which has been set aside or which has been acknowledged as having been set aside by the United States for the use of the tribe, the exterior boundaries of which are more particularly defined in a final treaty, Federal agreement, Executive or secretarial order, Executive or secretarial proclamation, United States patent, Federal statute, or final judicial or administrative determination.

25 C.F.R. § 151.2. However, the Tribe's claim as to the land described in Finding of Fact 13(a) cannot meet any of the definitions of reservation because the Tribe does not provide evidence that it ceded its lands and reserved a part or that the federal government set aside any tracts for its use as a reservation. Because the Tribe failed to present evidence of a last recognized reservation, it cannot claim that Akela Flats is located within that area. Thus, the Tribe cannot claim that exception under IGRA.

## II. Restored Lands for a Restored Tribe

The Fort Sill Apache Tribe also claims that Akela Flats meets the restored lands exception of IGRA. However, because the land was not placed into trust for the Tribe as part of a restoration, it does not qualify for the exception.

For trust lands to qualify for the restored lands exception, the tribe must present evidence that meets both of the following requirements: 1) the tribe has been restored to its federal recognition and, 2) the land at issue was placed in trust as part of a "restoration of lands" for the tribe. If the evidence presented fails to meet either of these requirements, then the land at issue cannot qualify for the restored lands exception.

After an examination of the evidence, we conclude that the Fort Sill Apache Tribe is not a restored tribe, and Akela Flats does not qualify for the restored lands exception under 25 U.S.C. § 2719(b)(1)(B)(iii).

### A. The Ft. Sill Apache Tribe's evidence is insufficient to prove that it constitutes a restored tribe.

To be considered restored, a tribe must present evidence of: 1) federal government recognition; 2) termination of recognition; and 3) restoration of recognition. *See Grand Traverse Band of Ottawa and Chippewa Indians v. Office of the U.S. Attorney for the W. Dist. of Mich.*, 369 F.3d 960, 967 (6th Cir. 2004).

#### 1. The federal government recognized the Fort Sill Apache's ancestors, the Chiricahua and Warm Springs Apache.

To claim federal recognition, a tribe must present evidence that shows that the federal government views it as an entity with:

> Immunities and privileges available to other federally acknowledged Indian tribes by virtue of their government-to-government relationship with the United States as well as the responsibilities, powers, limitations, and obligations of such tribes.[8]

The Fort Sill Apache descend from the Chiricahua and Warm Springs Apache Bands and claims its ancestors' federal recognition for its own. The Fort Sill Apache take their language, history, and culture from the Tribes that lived as one community. *Fort Sill Apache Tribe v. United States*, 19 Ind. Cl. Comm. 212, 221-223 (June 28, 1968). The Tribe considers the Chiricahua and Warm Springs Apache's territory to be its own ancestral homeland, and the courts agree. *Fort Sill Apache*, 19 Ind. Cl. Comm. at 224. Further, the court has declared the Fort Sill Apache Tribe to be the successor-in-interest

---

[8] *Comanche Nation v. United States of America*, Agreement of Compromise and Settlement Recitals, CIV-05-328-F at 7(i) (W.D.OK, March 8, 2007)(*citing* 70 Fed. Reg. 71194 at 1 (Nov. 25, 2005)).

15