to the Chiricahua and Warm Springs Apache. *Id.* at 215. Thus, the Fort Sill Apache Tribe is the same tribe and can claim the political history of its ancestors as its own. *Id.* at 220 (citing *Nooksack Tribe v. United States*, 3 Ind. Cl. Comm. 479; *Snake or Piute Indians v. United States*, 4 Ind. Cl. Comm. 576, 612).

With this in mind, the history of federal recognition of the Tribe is evidenced by the Treaty of July 1, 1852, and other contacts with the federal government.

### a. The Treaty of July 1, 1852.

In 1852, Colonel Sumner represented the federal government in treaty negotiations with the southwestern Apache tribes. *Id.* at 227. On July 11, 1852, Mangas Coloradas, chief of the Chiricahua Apaches signed the Treaty of July 1, 1852. *Id.* at 228. In this treaty, the Apache agreed to remain peaceful and not make war on each other or the United States. *See* Treaty with the Apache, July 1, 1852, Art. 2. The tribes agreed to designate formal boundaries and wield their sovereign powers to pass laws within their territory. *See* Treaty of July 1, 1852, Art. 9. Congress ratified the treaty on March 23, 1853. 10 Stat. 979.

This agreement is evidence of the federal government's recognition of the Chiricahuas Apache's sovereign status and the government-to-government relationship. *Fort Sill Apache*, 19 Ind. Cl. Comm. at 239. Because the Fort Sill Apache Tribe is a successor-in-interest to the Chiricahua and Warm Springs Apache, the Fort Sill Apache Tribe may also claim this previous recognition. *Comanche Nation*, CIV-05-328-F at 7(g).

### b. Other contacts with the federal government.

The Act of February 27, 1851[9] allowed the United States to extend the Indian Trade and Intercourse Act of June 30, 1834[10] to tribes in New Mexico. This included all Apache tribes. The Act extended the right of occupancy to all tribes in that area and made it illegal to dispossess tribes and individual members of that right.

This Act further evidenced the government-to-government relationship between the Chiricahua and Warm Springs Apache and the federal government. Thus, the descendents of the Chiricahua, its successor in interest known as the Fort Sill Apache Tribe, enjoyed that relationship and federal recognition.

### 2. The Tribe's evidence is insufficient to support the claim of termination of the Chiricahua and Warm Springs Apaches.

Resisting removal to the San Carlos Reservation, bands of Chiricahua and Warm Springs Apache engaged in hostilities with federal forces. *Fort Sill Apache*, 19 Ind. Cl. Comm. at

---

[9] 9 Stat. 574, 587.
[10] 4 Stat. 729.

244. On September 4, 1886, the Chiricahua under Geronimo surrendered, and the Apaches were taken to Florida as prisoners of war. *Id.* at 245. On this date, the federal government took away the Chiricahua Apache's aboriginal title to its lands in Arizona, New Mexico, and Mexico. *Id.*

This action, however, did not necessarily constitute the federal government's termination of the Tribe and a cessation of the government-to-government relationship. In fact, the United States military forces' decision to take the Chiricahuas as prisoners of war indicates that the Tribe was still considered a hostile but separate and sovereign entity. The Fort Sill Apache Tribe failed to provide any further evidence to connote termination of federal recognition. Thus, the Tribe's presented evidence fails to definitively establish termination.

### 3. The federal government accepted the Fort Sill Apache Tribal Constitution and agreed that the Fort Sill Apache acts as the successor in interest for its ancestors Tribe, the Chiricahua and Warm Springs Apache.

One way that the federal government may recognize an Indian tribe is through the Indian Reorganization Act (IRA) of 1934. 25 U.S.C. § 476(a). Under the IRA, a tribe may adopt a constitution by majority vote that is then sent to the Secretary of the Interior for approval. 25 U.S.C. § 476(a). On August 16, 1976, the Bureau of Indian Affairs approved the Fort Sill Apache Tribe's Constitution. *Comanche Nation*, CIV-05-328-F at 7(j) (*citing* 70 Fed. Reg. 71194). This approval reflects the government-to-government relations between the Tribe and the Federal government.

Further, the Tribe's status became a stipulated point in a 2007 trust land case involving the Comanche Nation and a Fort Sill Apache casino. *Id.* In that case, the Department of the Interior had transferred into trust a parcel of land that had once belonged to a member of the Comanche Nation but did this on behalf of the Fort Sill Apache Tribe. *Id.* at 1. The department's failure to notify the Comanche Nation led to a lawsuit that the parties settled under a set of stipulations. *Id.* The relevant stipulations are as follows:

> 7(g). The Fort Sill Apache Tribe is a successor-in-interest to the Chiricahua and Warm Springs Apache Tribes whose aboriginal territory, as defined by the Indian Claims Commission and as affirmed by the United States Court of Claims, includes those parts of Arizona and New Mexico where the United States currently holds land in trust for the benefit of the Fort Sill Apache Tribe.
>
> (h). The United States once maintained a government-to-government relationship with the Chiricahua and Warm Springs Apache Tribes, as evidenced by treaties, negotiations with tribal leaders, provision of services to the tribes and tribal members, and other government-to-

17

government relationships clearly identified in numerous legal actions maintained before the Indian Claims Commission, United States Court of Claims, United States District Courts, and the United States Department of the Interior Board of Indian Appeals.

(j). On or about August 16, 1976, the Commissioner of Indian Affairs formally approved the Constitution of the Fort Sill Apache Tribe, and thereafter the United States acknowledged the Fort Sill Apache Tribe to be a Federally Recognized Tribe, and has maintained a government-to-government relationship with the Fort Sill Apache Tribe since that date.

(l). The Fort Sill Apache Tribe has land in New Mexico held in federal trust status within the former aboriginal and/or Indian Title lands of the Chiricahua and/or Warm Springs Apache Tribes as defined by the Indian Claims Commission and the United States Court of Claims. The United States agrees to accept and timely process a Fort Sill Apache Tribe application for a reservation proclamation on land currently held in trust for the Fort Sill Apache Tribe which is located in Luna County, New Mexico.

Thus, the court and the United States agreed to the Fort Sill Apache's sovereignty and federal recognition. Further, these stipulations support the view that the Tribe was once recognized as the Chiricahua and that the Chiricahua Tribe was subsequently recognized as the Fort Sill Apache. The evidence presented, however, fails to show that the government-to-government relationship with the Chiricahua, and thus the Fort Sill Apache, suffered termination. Thus, the Fort Sill Apache Tribe has not presented sufficient evidence to establish that it is a restored tribe.

Because the Tribe has not established that it is a restored Tribe, we need not determine whether Akela Flats is part of a restoration of lands. However, the NIGC is concerned with the evidence presented and details its concerns below.

**B. Akela Flats is not conclusively part of a "restoration of lands."**

IGRA does not define *restore* and *restoration*, but absent express indication from Congress to the contrary, we must give the words their plain meaning. *Grand Traverse Band of Ottawa and Chippewa Indians v. Office of the U.S. Attorney for the W. Dist. of Mich.*, 198 F.Supp. 2d 920, 928 (W. D. Mich. 2002). IGRA does not require that a "restoration of lands" be accomplished through congressional action or in the very same transaction that restored the tribe to Federal recognition. Lands may be restored to a tribe through the administrative fee-to-trust process under 25 C.F.R. Part 151.[11]

---

[11] Grand Traverse Band of Ottawa and Chippewa Indians v. United States Attorney, 198 F. Supp. 2d 920, 935-36 (W.D. Mich. 2002), aff'd, 369 F.3d 960 (6th Cir. 2004) (Grand Traverse II); Confederated Tribes of Coos, Lower Umpqua & Siuslaw Indians v. Babbitt, 116 F. Supp. 2d 155, 161-64 (D.D.C. 2000); Grand

18

Limits exist, however, as to what constitutes restored lands. The exception is not meant to extend to "any lands that the tribe conceivably once occupied throughout its history." *NIGC Grand Traverse Opinion* at 15 (August 31, 2001). The United States District Court for the Western District of Michigan noted these limitations, stating that they exist to avoid a result that "any and all property acquired by restored tribes would be eligible for gaming."[12] The court continued:

> The term "restoration" may be read in numerous ways to place belatedly restored tribes in comparable position to earlier recognized tribes while simultaneously limiting after-acquired property in some fashion.

*Grand Traverse I*, 198 F.Supp. 2d at 935. Thus, courts now apply a three-factor test to determine whether land meets the restored lands exception under IGRA: (1) the factual circumstances of the acquisition, (2) the location of the acquisition, or (3) the temporal relationship of the acquisition to the tribal restoration. *Id*. These factors are a balancing test and not all factors must weigh in the Tribe's favor to meet the exception. *Id*. at 936. These factors together, however, must indicate overall that the Tribe acquired Akela Flats as part of its initial attempt to rebuild its land base.

On balance, we remain concerned that the factual circumstances and the location of the acquisition are not strong enough to fully support the Tribe's claim to restored lands.

### 1. The Tribe's evidence regarding the temporal relationship and the factual circumstances of the acquisition is insufficient to fully support the restored land claim.

#### a. Temporal relationship

One factor to be considered is whether there is a reasonable temporal connection between the restoration and the trust land acquisition. *Grand Traverse Band II* at 936 (finding that the land may be considered part of a restoration of lands on the basis of timing alone). The NIGC understands that once recognition occurs, a tribe still needs time to organize and create a constitution before taking land into trust. With that in mind, the NIGC analyzes a restored land claim to see if the land in question constitutes "part of a systematic effort to restore tribal lands." *Id*. at 936. Thus, the NIGC looks at two factors: 1) the time span between when the tribe was restored and when the land was acquired in trust, and 2) how many other parcels the tribe acquired in that time.

The Tribe's evidence of a temporal relationship between the acquisition and restoration is insufficient. The Tribe was recognized in 1976, but it admits that it waited to purchase

---

Traverse Band of Ottawa and Chippewa Indians v. United States Attorney, 46 F. Supp. 2d 689, 699-700 (W.D. Mich. 1999) (Grand Traverse I).

[12] *Grand Traverse Band I*, 46 F.Supp. 2d at 700; *Grand Traverse Band II*, 198 F.Supp 2d at 935.

Akela Flats until 1998. Further, the Tribe did not request that Akela Flats be placed into trust until 1999, and Akela Flats did not go into trust until 2002.[13] In short, the Tribe waited 23 years from recognition to acquire Akela Flats and request that it be placed into trust for gaming.

To date, the longest temporal period that the NIGC has considered for restored lands is 14 years.[14] The NIGC has found in favor of restored land claims for both the Grand Traverse Band[15] and the Bear River Band of Rhonerville Rancheria[16] when those tribes obtained trust land within nine and ten years after restoration respectively. The NIGC has not found in favor of the Karuk Tribe[17] and the Wyandotte Nation[18] when those tribes claimed restored lands for parcels taken into trust eighteen years after the tribes were restored.

The Tribe's evidence here is not strong enough to satisfy this temporal factor. We cannot find that Akela Flats constitutes restored lands solely on the passage of 23 years. Perhaps if the Tribe had met the other factors, we would be willing to push the outer limits of what has been previously considered an acceptable delay. However, that is not the case here.

### b. Other factual circumstances

The Fort Sill Apache Tribe asserts poverty and a difficult time with the land-into-trust process as circumstances that mitigate its late restored lands claim. To illustrate its point, the Tribe refers to the current settlement with the Comanche Nation. The Comanche Nation threatened to assert its jurisdiction over a parcel held in trust for the Fort Sill Apache Tribe. *See Comanche Nation v. United States*, Case No. CIV-05-328-F (W.D. OK May 27, 2005). (The Fort Sill Apache Tribe bought a parcel of allotted land from a Comanche member, placed it into trust, and started gaming on it. The Comanche Nation asserted that a treaty with the United States required its notification. As such, they sought to prevent Fort Sill Apache from acquiring any further Comanche parcels.). The Tribe insists that under these circumstances, its ability to acquire land into trust was precarious.

Despite the Tribe's claim to the contrary, the evidence does not support the idea that Akela Flats is part of the Tribe's initial attempts to reestablish its land base. In fact, the factual circumstances surrounding the acquisition of Akela Flats weigh against the Tribe. This factor weighs against the Tribe because the evidence indicates that the Tribe has

---

[13] *See* Warranty Deed between the Schoeppner Family Trust and the Fort Sill Apache Tribe (October 23, 1998); Warranty Deed between the Fort Sill Apache Tribe and the United States as trustee (June 26, 2002).
[14] *See Confederated Tribes of Coos, Lower Umpqua & Siuslaw Indians v. Babbitt*, 116 F.Supp. 2d 155 (D.D.C. 2000).
[15] *See* NIGC Opinion for Grand Traverse Band of Ottawa and Chippewa Indians, at 9 (August 31, 2001).
[16] *See* NIGC Opinion for Bear River Band of Rhonerville Rancheria, at 12 (August 5, 2002).
[17] *See* NIGC Opinion for Karuk Tribe of California, at 9 (October 12, 2004).
[18] *See* NIGC Final Decision and Order, *In re Wyandotte Nation Amended Gaming Ordinance*, at 14 (September 10, 2004).

20

acquired numerous parcels and focused its land acquisition efforts not in New Mexico but in Oklahoma.[19]

Prior to 1981, the Tribe received a $6 million award from the Court of Claims. *See* Fort Sill Apache Tribal Resolution, FSA-81-01 (January 17, 1981). Soon after receiving the money, the Tribe purchased 36.25 acres (and a 1/6 share of mineral rights) in Caddo County, Oklahoma for $52,562.50. Shortly after the Tribe purchased the land and accepted the deed, it passed a resolution permitting tribal leaders to purchase the 36.25 acres, and more land in Oklahoma, using funds from the Court of Claims. *See* FSA-81-01. However, the tribal resolution only authorized $150,000.00 to purchase land. *Id*. The resolution decreed that 80% of the $6 million award would become a per capita distribution for tribal members. *Id*.

Further, in June 1983, the Tribe used monies from the Bureau of Indian Affairs' land acquisitions fund to purchase more land. *See* Fort Sill Apache Tribal Resolution, FSA-83-7 (June 11, 1983). The Tribe purchased 2.5 acres in Caddo County, Oklahoma for $3,850.00.[20]

The Tribe made three more purchases in 1987. On January 5, 1987, the Tribe paid $8,600.00 for 3.75 acres in Oklahoma.[21] On that same day, the Tribe paid $14,500.00 for another 8.75 acres (absent mineral rights) in Caddo County, Oklahoma.[22] In addition, the Tribe spent $3,750.00 to purchase the mineral rights to a 12.5 acre parcel in Caddo County, Oklahoma.[23]

Additionally, the Tribe spent $24,056.25 in April 1988 for a 17.1975 acre parcel in Caddo County, Oklahoma.[24] In addition, the Tribe added to these holdings in 1989 by purchasing 1.25 acres (not including mineral rights) for $1,900.00.[25]

---

[19] The NIGC also notes that the Tribe owns 4.35 acres in Arizona, but the focus of this discussion centers on the Oklahoma parcels. The Tribe's Arizona holding is located in Cochise County, Arizona within its aboriginal territory. *See* Letter from Phoenix Office BIA Field Solicitor to the BIA Area Director regarding the Final Title Opinion for the land into trust acquisition of the Fort Sill Apache in Cochise County, AZ (July 22, 1992).

[20] *See* Warranty Deed between Harold Kawaykla and the United States as trustee for the Fort Sill Apache Tribe (July 14, 1983); *see also* FSA-83-7.

[21] *See* Warranty Deed between Mamie Lee Mahseet, Ramon Prouty, and the United States as trustee for the Fort Sill Apache Tribe (January 5, 1987).

[22] *See* Warranty Deed between Edmond Lee Mahseet *et al*. and the United States as trustee for the Fort Sill Apache Tribe (January 5, 1987).

[23] *See* Warranty Deed between Linda Lee Prouty *et al*. and the United States as trustee for the Fort Sill Apache Tribe (June 5, 1987).

[24] *See* Warranty Deed between Edmond L. Maheet *et al*. and the United States as trustee for the Fort Sill Apache Tribe (April 26, 1988).

[25] *See* Warranty Deed between William Kawaykla and the United States as trustee for the Fort Sill Apache Tribe (May 12, 1989).

In 1998, the Tribe acquired Akela Flats but did not request that it go into trust until 1999. Thus, the Tribe had already spent $109,218.75 to acquire 7 parcels totaling over 82 acres in trust in Oklahoma prior to this purchase.

Further, the Tribe continued to acquire parcels in Oklahoma after its purchase of Akela Flats. The Tribe's last two land acquisitions occurred in 1999 and 2001. In 1999, the Tribe paid $175,000.00 for 0.53 acres (absent mineral rights) in Comanche County, Oklahoma.[26] In 2001, the Tribe paid $200,000.00 for 160 acres in Caddo County, Oklahoma.[27]

Thus, the acquisition of so many Oklahoma parcels of land prior to the purchase of Akela Flats is contrary to an assertion of hardship and a claim that Akela Flats is part of the Tribe's initial attempts to rebuild its land base.

The NIGC has considered the issue of prior acquisitions in other cases. For example, the NIGC found that the Cowlitz Tribe's parcel constituted restored lands because the tribe had no land base when it applied for trust land. *Cowlitz Indian Tribe's Class II Gaming Ordinance*, NIGC Opinion (Nov. 23, 2005). Likewise, both the Mechoopda Tribe and the Bear River Band had very few parcels of land in trust before receiving a restored lands determination. *NIGC Mechoopda Opinion* (March 4, 2003). (The Mechoopda Tribe requested a restored lands determination for only its second trust acquisition.); *NIGC Bear River Band Opinion* (Aug. 5, 2003). (The Bear River Band requested a restored lands determination for its first trust acquisition.). In contrast, the NIGC found that the Wyandotte Tribe had acquired too many parcels in the interim for the requested land to be considered part of their initial attempts at rebuilding their land base. *In re: Wyandotte nation Amended Gaming Ordinance*, NIGC Final Decision and Order at 10 (Sept. 10, 2004). (The Wyandotte Tribe amassed three parcels totaling over 194 acres prior to obtaining the trust parcel at issue.).

Much like the Wyandotte Nation, the Fort Sill Apache Tribe has acquired many parcels of land during the years prior to its acquisition of the Akela Flats parcel. Further, the Tribe's attempts to move into New Mexico did not come until after the conflict and litigation involving the Comanche Nation. *See* Letter from Raymond Nauni Jr., Tax Administrator for the Comanche Tax Commission to Davis Qualls, Manager of the Fort Sill Apache Casino (March 21, 2000). (The letter warns the Fort Sill Apache Tribe of Comanche jurisdiction over its newly acquired Oklahoma lands two years prior to its Akela Flats land being placed into trust.). The factual circumstances indicate that Akela Flats is not part of the Tribe's earliest attempts to establish its land base. Thus, the factual circumstances do not appear to weigh in the Tribe's favor.

---

[26] *See* Warranty Deed between Robert and Linda Rowell and the United States as trustee for the Fort Sill Apache Tribe (March 24, 1999).
[27] *See* Warranty Deed between Truman and Donna Pearl Ware and the United States as trustee for the Fort Sill Apache Tribe (June 26, 2001).

22

As an aside, opponents to the Tribe's right to game at Akela Flats have raised concerns about the Tribe's promise not to use Akela Flats for gaming prior to the decision to take it into trust.[28] We address these concerns as a means to clarify what factors are relevant to a restored lands determination.

Opponents to the Tribe's claim point to the Tribe's initial plan to game on the parcel by obtaining the governor's consent for a two-part determination.[29] They also cite the Tribe's resolution to take the land in trust for gaming and the subsequent resolution that removed the gaming language. Fort Sill Apache Resolution FSA-98-26; *see also* Fort Sill Apache Resolution FSA-99-14. The opponents assert that many others have relied on what they considered a promise not to game and feel that they have done so to their detriment. *See* Letter from Ethel Abeita, BIA Acting Regional Director to Tribal Chairman Ruey Darrow dated July 23, 2001 (stating the Tribe dropped its request to take the land into trust *for gaming*, thus the parcel would be taken into trust absent the previously stated objections) (emphasis added); *see also* letter from BIA Acting Director Omar Bradley to Governor Gary Johnson dated August 11, 1999. Under this reasoning, they assert that the promise not to game on the land should be considered a factor in denying the Tribe's claim for restored lands.

The NIGC, however, has already found that a Tribe's original intended use of the land is not a relevant factor in a restored lands determination. *See* Memorandum from NIGC Acting General Counsel to NIGC Chairman Deer, Re: Bear River Band of Rohnerville Rancheria at 2, 14 (August 5, 2002). Further, case law does not support the contention that subjective intent and reliance on that intent may be considered as relevant factors in a restored lands analysis. *See Confederated Tribes of Coos, Lower Umpqua, & Siuslaw Indians v. Babbitt*, 116 F. Supp.2d 155 (D.D.C. 2000). Because the focus of the analysis is to determine the legal status of the land, and not the intended use, promises concerning future uses of the land cannot be considered an analytical factor.

For example, the Tribes in *Confederated Tribes of Coos* took land into trust for one reason, and then announced their intention to game 22 months after the acquisition was complete.[30] Despite the change of plan, the Tribes met all the requirements for the restored lands analysis and were able to use the parcel for gaming. Thus, broken promises are not part of the restored lands analysis.

---

[28] Letter from Senator Bingaman to NIGC Chairman Phil Hogen dated Jan. 29, 2008; *see also* Letter from Paul Bardacke of Sutin, Thayer, and Brown PA to Acting General Counsel Penny Coleman dated Feb. 15, 2008.

[29] Letter from New Mexico Governor Gary Johnson to Chief Mildred Cleghorn dated April 10, 1995; *see also* letter from New Mexico Governor Gary Johnson to BIA Area Director Robert Baracker dated April 1, 1999.

[30] DOI Memorandum from Philip Hogen, Associate Solicitor, Division of Indian Affairs to Assistant Secretary – Indian Affairs, Re: *Confederated Tribes of Coos, Lower Umpqua & Siuslaw Indians v. Babbitt*, 116 F. Supp.2d 155 (D.D.C. 2000) regarding proposed gaming on the Hatch Tract in Lane County, Oregon (Dec. 5, 2001) (*Coos Opinion*).

That is not to say that the NIGC is not disappointed when the government-to-government relationship is affected by broken promises. Broken promises affect the overall integrity of the process and the relationship between the federal family and tribes. The law, however, consistently shows that the NIGC cannot consider such factors in its analysis. *See Confederated Tribes of Coos*, 116 F. Supp.2d 155.

### 2. The Tribe's evidence regarding the location of the acquisition does not support the restored land claim.

The physical location of a trust acquisition is an important factor in determining whether the parcel constitutes restored lands. *NIGC Wyandotte Final Decision and Order* at 10; *NIGC Grand Traverse Opinion* at 17-18. In reviewing the Tribe's evidence, it is necessary to examine the location of Akela Flats to determine the Tribe's historical and modern connections to it. *Id*. In this case, the Tribe's modern connections to Akela Flats do not weigh in favor of finding that the land is restored.

### a. Historical Connections to the Land

The evidence presented shows that the land was historically significant to the Tribe. The NIGC looks at whether lands located "within areas historically occupied by the Tribe" were taken into trust as part of the restoration. *Grand Traverse I*, 198 F.Supp.2d at 701. To inform its decision, the NIGC looks at the Tribe's historical use of the land and the land's significance.

For example, the Bear River Band was able to show a historical connection to a site that was located one mile away from former villages, trails, and locations featured in tribal myths. *NIGC Bear River Band Opinion* at 10-11. Further, the Tribe occupied the land since 1300 B.C., making clear its historical significance to the Tribe. *Id*. Likewise, in order to prove a historical connection to its land, the Mechoopda Tribe provided evidence that the land in question was part of their aboriginal territory. *Id*.

Similar to the Bear River Band and Mechoopda, the Fort Sill Apache's land has historical significance to the Tribe. Much like the Bear River Band, the Tribe occupied its aboriginal territory "from time immemorial." *Fort Sill Apache*, 19 Ind. Cl. Comm. at 215. Until September 1886, the Chiricahua Apaches, to whom the Tribe is a successor in interest, occupied part of what is known today as Arizona, New Mexico, and Mexico. *Id*. More specifically, the Tribe lived in three primary locations that extended from Navajo country in the north down into northern Mexico. *Id*. at 220. The westernmost portion of the Tribe extended past the Chiricahua Mountain Range. The Tribe ranged westward along the Gila River to the Burro Mountains. *Id*. at 231.

Additionally, the Tribe hunted and subsisted for food, and thus it traveled over large tracts of semi-arid land to reach that food. *Id*. at 232. Subsistence, and the constant search

24

for water in a semi-arid land, required the Tribe to control and traverse great distances for its survival. *Id.* at 233. Seasonal camp sites were located throughout the territory, and these camps were generally near water because water meant good hunting and good pasture for horses. *Id.* Camps also moved with the changes in seasons, corresponding to the wild harvests. *Id.*

The Tribe's defense of its lands from both Spanish conquistadors and Mexican invaders also indicates its importance to the Tribe. *Id.* at 230. The Tribe continually defended its territory until 1886 from foreign invaders and American settlers. *Id.* at 234. The ferocity of the Tribe's defense is counted as a reason for the slow advance of white settlers in the area. *Id.* at 257-8.

Thus, the Tribe's evidence supports the historical connection to the land and its significance to the Tribe.

### b. Modern Connection to the Land

The Tribe's evidence of a modern connection does not support its restored lands claim. To find a modern connection to Akela Flats, the NIGC considers the Tribe's post-termination activities surrounding the land and its tribal members. *NIGC Wyandotte Opinion* at 21. Specifically, the NIGC asks whether the Tribe has maintained its connection to the land. In other words, the Tribe must show that Akela Flats has always been important to the Tribe and its members. The Tribe must show that Akela Flats maintained its significance throughout tribal history and into the present day. The Tribe's evidence, however, fails to definitively establish Akela Flats' on-going importance to the Tribe.

NIGC is concerned that the Tribe has not presented sufficient evidence that Akela Flats has maintained its significance throughout tribal history and into the present day. The Tribe had no contact with the parcel until 1998. The Tribe presented evidence of a general historical connection to the area until its forced removal in 1886. The Tribe provided a warranty deed indicating purchase and ownership of Akela Flats in 1998. *See* Warranty Deed between the Schoeppner Family Trust and the Fort Sill Apache Tribe (October 23, 1998).

The Fort Sill Apache Tribe also presents evidence of their modern connection to Akela Flats by way of consultations with government offices regarding actions near the site. For example, the Tribe received a request for consultation regarding archeological sites near Akela Flats.[31] Additionally, the Tribe received a request for consultations on utility lines

---

[31] *See* Letter from the Bureau of Land Management's District Manager Edwin Roberson to Chairman Houser dated April 12, 2007.

25

in Dona Ana County, New Mexico.[32] The Tribe has also received a request from the City of Sunland Park to consult on the improvements to a wastewater treatment plant located in Dona Ana County, New Mexico.[33] Further, the Tribe received a request for input from the Bureau of Indian Affairs regarding the cultural and archeological impact of a proposed casino in nearby Dona Ana County, New Mexico. *See* Letter from Bureau of Indian Affairs, Real Estate Superintendent Ms. Gutierrez to Chairman Houser dated Nov. 18, 2005. This request also inspired the Tribe to consider taking over the conservancy of protected sites in the area. *Id*.

These consultations, however, came after the Tribe acquired the parcel in 1998. The Tribe presents no other evidence of contact or local relationships before it acquired Akela Flats. Because the Tribe has provided no other evidence regarding a connection to the parcel in between the years of 1886 and 1998, it has failed to provide sufficient evidence of an on-going modern connection to Akela Flats.

Further, Akela Flats is over 540 miles away from all major Fort Sill Apache governmental offices. The Tribe currently maintains an inoperative casino and gaming commission office on the site but little else. In April 2008, the Tribe opened a restaurant and smoke shop.[34] The restaurant and smoke shop are in the same building that houses the inoperative casino. The lack of evidence regarding tribal offices dating from the land's initial purchase indicates that the Tribe has not maintained an on-going connection to Akela Flats.

Additionally, the Tribe presented evidence that is has approved the movement of the following programs to New Mexico: the Native American Graves Protection and Repatriation Act program; the Cultural Resources Management program; the Fort Sill Apache Environmental Protection Agency program; the Higher Education program; and the Per Capita program. *See* Letter from Phil Thompson, Fort Sill Apache Attorney to Esther Dittler, Attorney for the National Indian Gaming Commission, Re: Fort Sill Apache Tribe (April 7, 2008).

However, the Tribe has presented no evidence of the programs' actual movement and its activities in New Mexico. The Tribe's major programs, one for higher education credits and one for per capita payments, service its members by mail. Aside from the higher education program and the per capita program, it remains unclear how the programs service tribal members directly. Furthermore, no tribal members live on-site or adjacent

---

[32] *See* Letter from Carlos Pena, Division Engineer for the International Boundary and Water Commission to Fort Sill Apache Chairman Jeff Houser regarding notification and consultation for the effluent transmission line in Las Cruces, Dona Ana County, New Mexico (March 21, 2008).

[33] *See* Letter from Chris Grosso, Project Manager for Taschek Environmental Consulting to Fort Sill Apache Chairman Jeff Houser regarding Sunland Park North Wastewater Treatment Plant Improvements (February 22, 2008).

[34] *See* Dana M. Alba, *Tribe opening Akela restaurant while waiting for casino*, Las Cruces Sun News, http://www.lcsun-news.com/ci_8835050 (April 7, 2008).

26

to Akela Flats. In fact, most of the tribal members live in Oklahoma. Therefore, Akela Flats does not appear to have maintained its significance to tribal members.

Evidence of an on-going connection to the land, from historical times to the present day, is an important factor in establishing a restored lands claim. For example, the NIGC found that the Bear River Band was able to show that the desired parcel was only 11 miles from a tribal residential area and government offices. *NIGC Bear River Band Opinion* at 10. Likewise, the Grand Traverse Band had tribal members living near the parcel and receiving BIA services. *Grand Traverse Band II*, 198 F. Supp. 2d at 936.

On the other hand, the Wyandotte Nation did not possess a sufficient modern connection to a parcel that was 175 miles away from any major governmental office and population. *NIGC Wyandotte Opinion* at 21. Further, the Tribe could provide no evidence that the land maintained its importance to the Tribe's members because the Tribe's programs serviced members in Oklahoma. *Id.* (Wyandotte, Oklahoma was also home to the Tribe's Turtle Stop Convenience Store, Turtle Tot Learning Center, a Seniors Program, and education assistance programs).

The Tribe's forced removal from their aboriginal territory, and subsequent settlement in Oklahoma, helps explain the Tribe's lack of modern connections to Akela Flats. That fact alone, however, fails to explain why the Tribe did not establish any connections to the land until 1998. The Tribe received new recognition in 1976 but failed to establish modern connections to Akela Flats as a trust parcel for another 23 years. Instead, the Tribe focused on obtaining trust land in Oklahoma. As stated before, the Tribe's evidence of connections established to Akela Flats do not include functioning government offices. Nor do the connections established clearly indicate that Akela Flats has maintained its significance in the eyes of tribal members. Thus, the Tribe's evidence of modern connections to Akela Flats is insufficient.

### III. Initial Reservation

The initial reservation exception permits gaming on Indian lands acquired in trust after October 17, 1988, where the lands are taken into trust as part of the initial reservation of an Indian tribe acknowledged by the Secretary under the Federal acknowledgement process. 25 U.S.C. § 2719(b)(1)(B)(ii). This exception requires: 1) the land is part of the tribe's reservation; 2) the reservation is the Tribe's initial reservation; and 3) the Tribe was acknowledged by the Secretary of the Interior under the Federal acknowledgement process. The Tribe has failed to demonstrate that Akela Flats is designated a reservation, that Akela Flats is the Tribe's initial reservation, and that the Tribe was acknowledged through the Federal acknowledgment process.

The Tribe also asserts that the land has reservation status based upon the assignment of a reservation code to Akela Flats as indicated on the BIA's Land Titles and Records Office (LTRO) Document Recordation form. The BIA has informed us of the following:

27

> A function of the Bureau of Indian Affairs (Bureau) LTRO is to record documents, a function similar to a county recording office. Documents submitted by servicing Bureau agencies are to be accompanied by a document recording transmittal.
>
> The current form used in the Albuquerque LTRO contains a field titled "Reservation Code". [sic] This title is merely a field name intended to identify a code for a land area used in the automated land records system. It does not mean that the code identified in the field is strictly associated with a reservation – only a land area.
>
> The previously automated land records system has recently undergone an entire enhancement and data was converted to a new system. Many field names were changed to better identify their contents. The previously identified field name "Reservation Code" was changed to "Land Area Code". [sic]
>
> The document recordation form, itself, has not yet been modified to coincide with the new system's field names. The LTROs are in the process of ugrading [sic] all associations to the new system. The previous "Reservation Code" field will also be changed to "Land Area Code". [sic]

*See* letter from Donna M. Peigler, Manager, Albuquerque Land Titles Records Office, Bureau of Indian Affairs, to Whom It May Concern (March 13, 2006). The assignment of a reservation code does not mean that it is strictly associated with a reservation, but identifies a particular land area. *See* Letter from George T. Skibine, Acting Deputy Assistant Secretary for Policy and Economic Development, Department of the Interior, to Esther Dittler, Staff Attorney, NIGC (May 15, 2008). Assignment of a reservation code does not demonstrate that Akela Flats has been designated a reservation.

The Secretary has not yet processed the Tribe's application requesting that its trust land be proclaimed a reservation.[35] The Tribe has informed the NIGC that it filed a lawsuit in the United States District Court of the Western District of Oklahoma seeking enforcement of the Agreement of Compromise and Settlement in which the United States

---

35 On March 4, 2008, the Tribe met with the Office of the Office of the Secretary to discuss its reservation proclamation application. The Tribe and the Office of the Secretary noted that if the reservation proclamation application is approved, then there will be a change in land use. Therefore, the Tribe and the Office of the Secretary "agreed that at a minimum an Environmental Assessment (EA) would have to be done for this Federal action in order to comply with the National Environmental Policy Act (NEPA)." Letter from Carl J. Artman, Assistant Secretary – Indian Affairs, Department of the Interior, Office of the Secretary to Jeff Houser, Chairman, Fort Sill Apache Tribe of Oklahoma (April 11, 2008).

28

agreed "to accept and timely process an [sic] Fort Sill Apache Tribe application for a reservation proclamation on land currently held in trust for the Fort Sill Apache Tribe which is located in Luna County, New Mexico." *Comanche Nation v. United States of America*, Agreement of Compromise and Settlement Recitals, CIV-05-328-F at 7(l) (W.D.OK, March 8, 2007).

Moreover, the initial reservation exception is limited to tribes acknowledged through the federal acknowledgment process. "Acknowledgment is a specifically defined term under the IGRA, because the statute expressly references a federal administrative process [,] 25 C.F.R. Part 83, by which the agency acknowledges the historical existence of a tribe." *Grand Traverse Band of Ottawa and Chippewa Indians v. United States Attorney for the Western District of Michigan*, 46 F. Supp. 2d 689, 699 (W.D. Mich. 1999). George Skibine, Acting Deputy Assistant Secretary for Policy and Economic Development, informed the NIGC that the Tribe was not acknowledged through the federal acknowledgment process. *See* Letter from George T. Skibine, Acting Deputy Assistant Secretary for Policy and Economic Development, Department of the Interior, to Esther Dittler, Staff Attorney, NIGC (May 15, 2008); *also see* Status Summary of Acknowledgment Cases, Prepared by the Office of Federal Acknowledgment, Assistant Secretary – Indian Affairs (Feb. 15, 2007) (Lists forty tribes whose status was determined through the acknowledgment process, as of February 15, 2007). Rather, the most recent evidence of the Tribe's recognition is when the Commissioner of Indian Affairs approved the Tribe's constitution on August 16, 1976. *Comanche Nation v. United States of America*, Agreement of Compromise and Settlement Recitals, CIV-05-328-F at 7(j) (W.D.OK, March 8, 2007).

The Tribe argues that the exception applies to all federal actions that result in the recognition of a tribe. The Tribe argues that the term "federal acknowledgement process" is ambiguous. Under this theory, the Tribe attempts to argue that statutory rules of construction enable it to interpret "federal acknowledgment process" under a plain meaning standard and that the phrase means any federal action that constitutes recognition. However, "federal acknowledgement process" is a term of art that is commonly understood to refer to the regulations adopted by the Secretary in Part 83. "It is a well-established rule of statutory construction that when Congress uses a term of art . . . unless Congress affirmatively indicates otherwise, we presume Congress intended to incorporate the common definition of that term." *United States of America v. Dante Vargas-Amaya*, 389 F.3d 901, 904 (9th Cir. 2004).

Further, the recognition of tribes prior to the development and implementation of the BIA's federal acknowledgment regulations cannot be fairly identified as a process. It was, in fact, this lack of process that required the development of the process now contained in 25 C.F.R. Part 83. The preamble to the final rule explains:

> Various Indian groups throughout the United States have requested that the Secretary of the Interior officially acknowledge them as Indian tribes.

29

> Heretofore, the limited number of such requests permitted an acknowledgment of the group's status on a case-by-case basis at the discretion of the Secretary. The recent increase in the number of such requests before the Department necessitates the development of procedures to enable the Department to take a uniform approach in their evaluation.

*See* Procedures for Establishing that an American Indian Group Exists as an Indian Tribe, 40 Fed. Reg. 39361 (Sept. 5, 1978). The purpose of these procedures is the "establish a departmental procedure and policy for acknowledging that certain American Indian tribes exist." *Id.* at 39362.

The Tribe may not claim this exception because it was not recognized through the Federal acknowledgement process. Furthermore, Akela Flats is not a reservation and the Tribe's application for a reservation proclamation remains pending. Therefore, if the Tribe had been acknowledged by the Secretary under the Federal acknowledgment process, 25 C.F.R. Part 83, the Tribe's land would not qualify under the initial reservation exception because the land has not been proclaimed a reservation.

## Conclusion

Based upon the foregoing, we conclude the Tribe may not lawfully conduct gaming on the proposed site. The Tribe has failed to demonstrate that its New Mexico trust land is located within the Tribe's last recognized reservation within the State or States within which the Tribe is located. In addition, the Tribe does not meet the requirements of the initial reservation or demonstrated that it is a restored tribe.

The Department of the Interior Office of the Solicitor concurs that the Tribe may not game on Akela Flats.